Charles W. **STRUBE**, individually and as Trustee of the Charles W. Strube Revocable Trust, on behalf of himself and all others similarly situated, Plaintiff,

v.

**AMERICAN EQUITY INVESTMENT LIFE INSURANCE CO.,**
Defendant.

No. 6:01 CV 1236 ORL 19DAB.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 8, 2005.

John R. Hargrove, Gordon, Hargrove & James, P.A., Ft. Lauderdale, FL, William H. Davis, Law Office of William H. Davis, Orlando, FL, H. Lee Sarokin, Rancho Santa Fe, CA, for Plaintiff.

Donald Lee Craig, Andrew L. Patten, Butler, Pappas, Weihmuller, Katz & Craig LLP, Charles F. Smith, Donna L. McDevitt, Eric J. Gorman, Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, IL, for Defendant.

William F. McMurry, Ross T. Turner, McMurry & Associates, Louisville, KY, Joe R. Whatley, Richard P. Rouco, Whatley Drake, LLC, Birmingham, AL, Tom Poulton, DeBeviose & Poulton, Winter Park, FL, for Beverly Malone.

## ORDER

FAWSETT, Chief Judge.

This case comes before the Court on the following:

1. Parties' Stipulation of Settlement (Doc. No. 188, filed Apr. 8, 2004); Parties' Amended Stipulation of Settlement (Doc. No. 233, Ex. 1, filed Sept. 2, 2004); Parties' Statement Regarding Valuation of the Proposed Class Settlement (Doc. No. 235, filed Sept. 2, 2004).

2. Beverly Malone's Objection to Proposed Class Action Settlement (Doc. No. 212, filed July 26, 2004); Beverly Malone's Supplemental Response to Proposed Revisions to Class Settlement (Doc. No. 240, filed Sept. 10, 2004).

3. Notice of Filing Objections of Robert Kerney and Maria Burns to Proposed Class Settlement (Doc. No. 225, filed Aug. 20, 2004).

4. Defendant's Reply Memorandum in Support of Class Settlement Approval (Doc. No. 218, filed Aug. 16, 2004); Plaintiffs' Response to Objections to Proposed Class Settlement (Doc. No. 222, filed Aug. 16, 2004).

### Procedural Background

Plaintiff Charles Strube initiated this class action lawsuit against Defendant on September 28, 2001, in Florida state court. (Doc. No. 4, filed Oct. 22, 2001). Defendant removed the case to this Court based on its diversity jurisdiction pursuant to 42 U.S.C. § 1332. (Doc. No. 1, filed Oct. 22, 2001). Without opposition and upon leave of Court, Plaintiff filed the First Amended Class Action Complaint adding Wilbert Norris and two other individuals as plaintiffs (Doc. No. 46, filed Feb. 20, 2002), as to which Defendant then filed a motion to dismiss. (Doc. No. 50, filed Mar. 25, 2002). Plaintiffs filed a Second Amended Complaint, again without opposition from Defendant (Doc. No. 78, filed May 23, 2002), but the Court dismissed such complaint without prejudice upon Defendant's subsequent motion. (Doc. No. 145, filed Feb. 18, 2003). On February 20, 2003,

the Court denied Plaintiffs' motion for class certification without prejudice to reassert the motion at a later time. (Doc. No. 150, filed Feb. 20, 2003).

Plaintiffs Strube and Norris filed a Third Amended Class Action Complaint seeking damages and other relief based on Defendant's alleged fraudulent misrepresentation/omission, negligent misrepresentation, and negligence. (Doc. No. 155, filed April 7, 2003). The Court denied Defendant's motion to dismiss the complaint (Doc. No. 171, filed Aug. 1, 2003), and Defendant then filed its Answer and Affirmative Defenses. (Doc. No. 173, filed Sept. 16, 2003). On December 2, 2003, the Court granted the parties' joint motion for a stay of proceedings in light of ongoing settlement negotiations, and such stay was then extended until March 31, 2004. (Doc. No. 179, filed Dec. 3, 2003; Doc. No. 182, filed Feb. 3, 2004; Doc. No. 184, filed Mar. 19, 2004).

The parties notified the Court on March 24, 2004, that a settlement had been reached and filed a Stipulation of Settlement for the Court's approval shortly thereafter. (Doc. No. 185, filed Mar. 24, 2004; Doc. No. 188). The Court held an Initial Fairness/Certification Hearing on May 19, 2004 (Doc. No. 197, filed May 19, 2004), after which the Court granted Plaintiffs' motion for preliminary approval of the settlement and preliminary certification of the proposed nationwide class. (Doc. No. 200, filed May 20, 2004). In accordance with the terms of the settlement agreement and the Court's Order granting preliminary approval, Defendant mailed a Court-approved Class Notice by first-class mail on June 22 and 23, 2004, to the last known addresses of approximately 23,000 reasonably identifiable class members and re-mailed all notices which were returned with a forwarding address by July 14, 2004. (Doc. No. 218, Ex. 2, Carlson Decl.). Furthermore, Defendant published Summary Notice in the national edition of the *Wall Street Journal* on July 1 and July 2, 2004. (*Id.*).

Upon receipt of the Class Notice, thirty-five (35) class members properly excluded themselves from the settlement class (Doc. No. 227, filed Aug. 20, 2004), and class members Beverly Malone, Robert Kerney, and Maria Burns filed timely objections to the proposed settlement. (Doc. No. 212; Doc. No. 225, Ex. 1, 2). The Court held a Final Fairness Hearing on August 23, 2004, at which counsel for Malone presented oral argument in objection to the settlement and class counsel and counsel for Defendant each argued in support of the agreement. Finally, the Court heard from class members Leonard Strickland, Jr., and Dennis Jackson. Subsequent to the hearing, the parties filed an Amended Stipulation of Settlement (Doc. No. 233) which the Court now considers for final approval.

### Nature of Allegations in the Third Amended Class Action Complaint

Plaintiffs allege that Defendant engaged in a wrongful scheme to develop, market, advertise, and sell certain annuities called "equity indexed annuities" through a centrally organized strategy, targeting senior citizens as potentially vulnerable buyers. (Doc. No. 155, ¶ 11). The equity indexed annuity is similar to a variable annuity which is sold and registered as a security in accordance with federal law and can only be marketed and sold through sales personnel who are licensed and registered to sell securities. (*Id.* at ¶ 12(a)). The equity indexed annuity invests only in bonds and in the issuing company's general account, enabling its issuers and agents to market and sell it without registration, regulation or qualification under securities laws. (*Id.*).

The standardized sales process for the equity indexed annuity involves an agent meeting with an elderly prospective purchaser, establishing a relationship of trust and confidence, then giving an incomplete and misleading description about the product. To accomplish this, Defendant does not adequately screen new sales agents or train its agents about the details of the product even though it knows the product is complex. (*Id.* at ¶¶ 16, 21). Since the agents are merely conduits of information, they are unable to dispense an appropriate level of information about the product to the customers, so the customers cannot be sufficiently informed about what they are purchasing. (*Id.*).

As an incentive to enlist its network of agents, Defendant offers extremely high commissions which are not disclosed to the prospective purchasers at the time of sale. (*Id.* at ¶ 21). By offering strong financial incentives to maximize sales, Defendant has fostered the use of high pressure and deceptive sales tactics. (*Id.* at ¶ 22). This creates an environment in which the agents are effectively encouraged to "do whatever is necessary to make a sale." (*Id.* at ¶ 16).

As part of the sales process, Defendant requires the agents to use only company-approved materials and forms, including applications and disclosures that misrepresent and conceal critical information. (*Id.* at ¶¶ 19, 23–25). Additionally, while statutes provide for a "free look," usually 30 days, the disclosure form omits any reference to this "free look" right. (*Id.* at ¶ 42). Due to misrepresentations and omissions in Defendant's standardized sales presentation, the disclosure statement and other sales materials, the prospective purchasers are led to believe, among other things:

(a) The purchaser will be able to structure a retirement income flow that he or she can not outlive. In reality, neither the written disclosure statement nor Defendant's standardized sales pitch discloses that annuity purchasers cannot annuitize until a date past his or her life expectancy, making it statistically unlikely that the elderly purchaser will live long enough to receive the promised retirement income flow. (*Id.* at ¶¶ 26–28);

(b) The invested funds will be easily accessible, and withdrawals will be virtually without penalty. In reality, however, the annuity purchasers will suffer substantial penalties for withdrawals made within the first 15 years or more of the annuity contract date, making this product particularly inappropriate for elderly purchasers who will be unlikely to outlive the annuity's surrender charge period. (*Id.* at ¶¶ 29–31);

(c) There are no "up-front" sales charges. However, excessive, undisclosed commissions paid to the battery of sales agents results in a diminution of the annuity's value and violates the imputed trust and fiduciary responsibility to customers. (*Id.* at ¶¶ 32–34);

(d) Customers will realize gains on the entire investment based upon increases in the Standard and Poor's Index. However, the return rate is applied only to a portion of the investment determined by a complicated formula not easily understood by the targeted purchasers. Moreover, by repeatedly referring to the Standard and Poor's Index and by using phrases such as "easy access to your funds," and "guaranteed" values, Defendant has intentionally crafted its disclosure statement and other sales materials to create the illusion that a customer's money will be earmarked in an individual account and will be invested in a true market index. Actually, all of a purchaser's money is placed in Defendant's general corporate account with part of the money being used to buy "call options" in the bond market and the rest being used to pay for general corporate expenses. This fact and the attendant risks are never disclosed to customers. (*Id.* at ¶¶ 35–36);

(e) Customers will benefit from a more favorable tax treatment. While Defendant's sales materials tout tax deferral as the primary selling point, Defendant knew through the application process that many of the investments which Plaintiffs were surrendering in order to buy Defendant's annuities are already tax deferred. Defendant was further aware and failed to disclose that, unlike other retirement investments, distributions from these annuities will be taxed as ordinary income and no stepped-up basis will be allowed upon the death of the annuitant. Notwithstanding, Defendant systematically encouraged its sales agents to recommend to these elderly customers that they need to roll their money into this annuity for its tax advantages. (*Id.* at ¶¶ 37–39).

*Strube Allegations*

In early 1999, Charles Strube, age 73, was called on in his home by Defendant's agent, Michael Lait, who informed him that several of his existing annuities were maturing and that he should surrender those annuities and use the proceeds to purchase Defendant's equity indexed annuities. (*Id.* at ¶ 66). Lait employed Defendant's standardized application, benefit summary, and life insurance replacement forms. (*Id.* at ¶¶ 67–68). Strube alleges that the benefit summary misrepre-

sented the fact that substantial surrender charges would be in effect for withdrawals of more than ten percent (10%) of the initial premium for the first fifteen (15) years of the annuity. (*Id.* at ¶¶ 69, 73). He further alleges that he was not informed of the significant costs associated with liquidating his existing policies, that the benefits promised by Lait were illusory, that his investment would be diminished by sales charges and excessive agent commissions, and that his premium would not be invested in equity investments. (*Id.* at ¶¶ 68, 70, 72).

Strube claims that he relied on the misrepresentations contained in Defendant's written materials in concluding that he would attain liquidity by purchasing Defendant's product. (*Id.* at ¶ 74). Strube completed and signed the forms provided by Lait on March 22, 1999, thereby surrendering his existing annuities, and subsequently applied the proceeds of more than $800,000 to the purchase of five equity indexed annuities from Defendant. (*Id.* at ¶¶ 76–77).

*Norris Allegations*

At the age of 68, Wilbert Norris was called on by Defendant's agent Cheryl Ferrari, who informed him that his Individual Retirement Account (IRA) was losing money and that an equity indexed annuity, based on an equity market index, would provide him with a guaranteed income of five percent (5%) per year. (*Id.* at ¶¶ 80–81). Like Strube, Norris alleges that the uniform materials provided by Defendant through Ferrari misrepresented or failed to disclose vital information regarding (1) surrender charges for the first 15 years of the annuity, (2) the promised tax benefits of purchasing Defendant's product, (3) the diminution of his investment due to sales charges and commissions, and (4) the fact that the premium would not be invested in equity investments. (*Id.* at ¶¶ 83–84).

Norris allegedly relied on the information he received from Defendant's marketing materials and Ferrari's representations that he would suffer no surrender charges, no risk, no management fees, no local charges, and no commissions in forming the belief that he would have liquidity and income for his lifetime with the equity indexed annuity. (*Id.* at ¶¶ 85–86). Norris purchased Defendant's an-

nuity product on September 29, 1999, after cashing in his IRA for $35,000. (*Id.* at ¶¶ 80, 87). Finally, Norris alleges that he chose not to exercise his "free look" right to rescind the contract upon discovering the 15–year period of the policy, after he was assured by Ferrari that the term was "for the company's benefit," not for him. (*Id.* at ¶ 88).

### Terms of the Proposed Settlement

As defined in the Amended Stipulation of Settlement, the proposed class includes all persons or entities who have an ownership interest in one or more Equity Indexed Annuities identified as Index–1, Index P–3, Index–4, Index–5, Index–6, Index–8, Index–10, and Index–12, issued by Defendant between November 1, 1995, and the date of class certification. (Doc. No. 233, § II(12), (36)). The class does not include any person or entity "(i) who is deceased and the contract death benefit has been paid to the designated beneficiary; (ii) who when surrendering their Policy instructed Defendant to forward the refunded proceeds directly to another company for reinvestment in an insurance or annuity product; (iii) who, while represented by counsel, signed a document that operates to release Defendant from any claims concerning such Policy; (iv) whose Claim respecting such Policy has been finally adjudicated in a court of law; or (v) who has timely excluded himself or herself from the Class...." (*Id.*, § II(12)).

*Non–Economic Relief*

In response to Plaintiffs' allegations concerning the insufficient training of agents and the methods by which Defendant marketed and sold its annuities, the proposed settlement provides that Defendant shall implement a web-based system of training its agents in compliance with applicable law and industry guidelines and provide financial incentives to encourage agents' participation in such training and continuing education. (*Id.*, § III(A)(1)). Defendant will monitor the point of sale by adopting guidelines and procedures to ensure that its agents disclose information about products and make appropriate recommendations to customers in an understandable manner, and by implementing a system of tracking sales and transac-

tions by which Defendant can detect agent practices that do not comply with industry and legal standards. (*Id.*, § III(A)(2)). Post-sale monitoring will be achieved in part through policies and procedures for properly identifying, evaluating and handling customer complaints, supervision and review of all sales and marketing practices, continuing training in company policies and industry and legal standards, post-sale customer surveys, and field inspections of agents and agencies. (*Id.*, § III(A)(3)). Furthermore, Defendant will ensure that its marketing materials are informative, truthful, and "tested for comprehension in relation to market demographics." (*Id.*, § III(A)(4)). An Oversight and Compliance Committee, comprised of class counsel and counsel for Defendant or their appointed successors, shall monitor Defendant's implementation of these non-economic relief policies and programs. (*Id.*, §§ II(32), III(A)).

### General Policy Relief

This type of economic relief provided under the proposed settlement will require no demonstration by the class member of fault or wrongdoing on Defendant's part and is designed to satisfy those class members in need of immediate income. (*Id.*, § III(B)). All class members will receive this general relief unless they expressly choose individual claim relief, discussed *infra*. (*Id.*, § III(B)(1)).

Under general policy relief, class members may "elect to annuitize his or her contract value over a period of at least ten (10) years and life expectancy. Such option may be elected immediately or at any time during the contract term." (*Id.*, § III(B)(1)(a)). In addition, a two percent (2%) annuitization bonus will be added to the value of the policies of those class members choosing enhanced annuitization. "For example, a Policy with a $100,000.00 contract value at the time annuitization is elected will be annuitized based upon a value of $102,000.00...." (*Id.*, § III(B)(1)(b)). Finally, class members who have previously surrendered their policies and directly received the refunded proceeds may elect to return such proceeds to Defendant in order to receive an immediate annuitization benefit and the 2% policy enhancement. (*Id.*, § III(B)(1)(c)).

### Individual Claim Relief

Any class member who believes that the general policy relief provides insufficient compensation for the actual harm he or she claims to have suffered may elect to forego such general relief and pursue an individual review as to both liability and damages by a Claims Review Panel, composed of three individuals appointed by class counsel and counsel for Defendant. (*Id.*, §§ II(10), III(B)(2)(a)).

A class member choosing this option must submit a claim form containing a full description of his or her claim, any and all documents in the individual's possession relating to the subject policy, and a sworn affirmation or declaration as to the veracity of the information and documentation provided. (*Id.*, § III(B)(2)(b)(i)). The Claims Review Panel will review, assess and resolve in writing each individual claim within 180 days of receipt of the completed claim form, and may offer the claimant any appropriate relief. (*Id.*, § III(B)(2)(b)(ii), (B)(2)(c)). The settlement agreement imposes no cap and no restriction on the amount or nature of relief available. Should the panel conclude that individual relief is not warranted by the claim, it may choose to offer such claimant general policy relief. (*Id.*, § III(B)(2)(c)).

Decisions of the Claims Review Panel may be appealed to the Oversight and Compliance Committee, the decision of which shall be final and binding on both parties. However, disputes between members of the Oversight and Compliance Committee shall be resolved by a mediator and, if mediation is unsuccessful, by the Court. (*Id.*, § III(B)(2)(d)).

### Release

In consideration for the economic and non-economic relief afforded by Defendant under the proposed settlement agreement, Plaintiffs and all class members shall release and discharge Defendant and "Defendant's past and present officers, directors, employees, branch managers, Agents (including those acting on an Agent's behalf or at the Agent's direction)..." all claims "that have been, could have been, may be or could be alleged

or asserted now or in the future by Plaintiffs or any Class Member...on the basis of, connected with, arising out of, or related to, in whole or in part, the Released Transactions." (*Id.*, §§ II(42), VII(A)(1)). The agreement defines "Released Transactions" as "the marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, performance, retention, administration and/or replacement...of [Equity Annexed Annuities issued by Defendant during the Class Period]." (*Id.*, § II(36), (41)).

### Attorney's Fees

The proposed settlement agreement further provides that, in accordance with Federal Rule of Civil Procedure 23(h), class counsel may apply to the Court for an award of attorney's fees not to exceed $1,700,000.00, and Defendant shall not oppose such application. (*Id.*, § VIII).

## Class Certification

Before certifying a class, the Court must be satisfied that several prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In addition, the proposed class must meet the requirements of one of three class types outlined in Rule 23(b). In the instant case, the parties seek certification under Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to the members of the class predominate" over individual issues of law or fact, and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." While the proposed settlement is relevant in that the Court "need not inquire whether the case, if tried, would present intractable management problems," the requirements of Rule 23 must nevertheless be satisfied "to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

In its Order granting preliminary certification, the Court found that the proposed class satisfied the requirements of Rule 23(a) and (b). (Doc. No. 200). Of the objections brought before the Court for consideration since that initial ruling, none have taken issue with the propriety of the class as defined in the Amended Stipulation of Settlement.

### Numerosity

■ The Eleventh Circuit has stated that, generally, more than forty (40) putative class members is sufficient to make joinder of all members impracticable. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986). In the instant case, Defendant has reasonably identified 23,000 class members, and the Court finds that the numerosity requirement of Rule 23(a)(1) is easily satisfied.

### Commonality

■ To meet the requirement of Rule 23(a)(2) that there be "questions of law or fact common to the class," the Court must find only that "at least one issue exists that affects all or a significant number of proposed class members." *Elkins v. Equitable Life Ins. Co. of Iowa*, 1998 WL 133741, *11 (M.D.Fla.1998) (citation omitted). Commonality may be established where there are allegations of "common conduct or standardized conduct by the defendant directed toward members of the proposed class." *Id.* at *12. Plaintiffs have alleged that Defendant engaged in a nationwide marketing and sales program by which customers were fraudulently or negligently misled as to the benefits of purchasing its equity indexed annuities through the use of standardized forms and uniform sales pitches, and accordingly, the Court finds that the commonality requirement is satisfied.

### Typicality

■ Rule 23(a)(c) requires that "the claims of the class representatives arise from the same broad course of conduct that gives rise to the claims of the other class members...." *Id.* at *13. Typicality is not defeated by slight factual differences between the representatives and the rest of the class.

*Id.* In the instant case, Plaintiffs allege that they fell victim to and suffered damage as a result of Defendant's fraudulent and deceptive marketing and sales campaign, the same scheme that they allege Defendant used against other class members in selling its annuity products. Therefore, Plaintiffs claims are typical of the claims of the class.

### Adequacy of Representation

■ The final condition of Rule 23(a) demands that the interests and legal rights of absent class members be protected by ensuring adequate representation on the part of both the class representatives and their counsel. *Id.* at *14. First, the representatives "must appear to be capable of prosecuting the actions through qualified, experienced and competent counsel." *Id.* Since the inception of the instant suit, class counsel have exhibited competence, and the Court is satisfied that they are experienced and well qualified to prosecute this litigation on behalf of the class.

Secondly, the Court must find that there is "no antagonism or disabling conflict between the interests of the named class representatives and the interests of the members of the class." *Id.* Here, as in *Elkins,* Plaintiffs and all other class members "can claim to be harmed by [Defendant's] alleged misconduct and all [c]lass [m]embers have the mutual incentive to establish the alleged fraudulent scheme." *Id.* Additionally, where adequacy of representation is considered in the settlement context, "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981). In the case at bar, all class members have an equal interest in achieving the best possible result in settlement negotiations, and the agreement before the Court "does not discriminate or allocate relief among different segments of the [c]lass." *Elkins,* 1998 WL 133741, *11. Having found class counsel to be competent and qualified to prosecute the litigation and finding that there is no conflict of interest between Plaintiffs and the rest of the class,

the requirement under Rule 23(a)(4) is satisfied.

### Predominance/Superiority

■ The predominance requirement of Rule 23(b)(3) is "far more demanding" than the commonality question in Rule 23(a)(2) in order to ensure that "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 624, 117 S.Ct. 2231. The rule provides several factors to be considered by the Court in determining whether common questions of law or fact "predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy:"

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). In *Amchem,* an asbestos products liability action, the Supreme Court held that the predominance requirement was not met where individual class members had been exposed to various products containing asbestos for widely differing amounts of time and in different ways, and where some class members had already experienced debilitating physical injury while others exhibited only early symptoms and still others had not yet developed any signs of injury. 521 U.S. at 624, 117 S.Ct. 2231.

The facts in *Amchem* are distinguishable from the instant action. Plaintiffs allege that all class members were presented with the same standardized marketing materials which deceived, misinformed, and failed to disclose vital information to elderly customers with regard to the sale of the same equity indexed annuities, taking advantage of their age with the knowledge that they were unlikely to survive long enough to reap the benefits of their purchase. The fraudulent course of conduct alleged in the complaint is

common to all class members, and individual variations of fact would be insufficient to defeat predominance. *See Elkins*, 1998 WL 133741, *15 (citation omitted) (finding predominance requirement satisfied where complaint alleged that insurance company engaged in common course of conduct and used standardized materials to fraudulently market life insurance policies).

█ Class members have exhibited little interest in individually controlling the prosecution of separate actions, only 35 of them having elected to exclude themselves from the class. Only two other suits are currently pending against Defendant related to the sale of annuities. The first action pending is that of Beverly Malone in Kentucky state court, discussed in more detail, *infra*.[1] The other suit was filed in California after this Court entered its Order preliminarily approving class certification and enjoining class members from initiating any action based on or related to the allegations in this case.[2] (Doc. No. 200). Significantly, the plaintiffs in each of those actions seek to certify and represent classes in their own right, a fact which further supports a finding that class action is appropriate in the instant case. Finally, the third and fourth factors listed by Rule 23(b)(3) concerning the interest in concentrating the action in a particular forum and the manageability of a class action become "conceptually irrelevant in the context of settlement." *Elkins*, 1998 WL 133741, *19 ("With the settlement in hand, the desirability of concentrating the litigation in one forum is obvious....") (citing *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231).

Having found that the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) have been satisfied, that common questions of fact and law predominate over the individual issues of class members, and that a class action is the superior method of adjudicating this controversy, the Court rules that certification of the class as defined in the Amended Stipulation of Settlement is appropriate.

### Fairness/Adequacy of Settlement

█ Rule 23(e)(1) mandates that any settlement or voluntary dismissal of a class action be subject to the approval of the Court but does not set forth specific standards to be applied in granting such approval. A proposed settlement must be "fair, adequate and reasonable and [must not be] the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977)). In *Bennett*, the Eleventh Circuit underscored the "strong judicial policy favoring settlement as well as [ ] the realization that compromise is the essence of settlement." *Id.* (citing *United States v. City of Miami*, 614 F.2d 1322, 1344 (5th Cir.1980)). There are several factors for the Court to consider in determining whether to approve the settlement agreement before it:

(a) The likelihood of success at trial and potential recovery;

(b) The complexity, expense and duration of litigation;

(c) The terms of the settlement;

(d) The procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views;

(e) The judgment of experienced counsel for the plaintiff class;

(f) The substance and amount of opposition to the settlement; and

(g) The stage of the proceedings at which the settlement was achieved.

*Elkins*, 1998 WL 133741, at *25 (citing *In re Corrugated Container*, 643 F.2d at 212; *Warren v. City of Tampa*, 693 F.Supp. 1051, 1055 (M.D.Fla.1988)).

### Likelihood of Success at Trial and Potential Recovery

"It is not necessary to try the merits of the case in connection with reviewing the settlement.... Thus, the Court can limit its inquiry to determining 'whether the possible re-

---

**1.** *Malone v. Addison Ins. Mktg., Inc.*, Civil Action No. 01–CI–02109, Division 1, Jefferson Circuit Court, Kentucky. (Doc. No. 223).

**2.** *Calif. Advocates for Nursing Home Reform v. American Equity Investment Life Ins. Co.*, No. CGC–04–435933, Superior Court, County of San Francisco. (Doc. No. 249, filed Jan. 26, 2005).

wards of continued litigation with its risks and costs are outweighed by the benefits of the settlement.'" *Elkins,* 1998 WL 133741 at *25 (quoting *Ressler v. Jacobson,* 822 F.Supp. 1551, 1553 (M.D.Fla.1992)).

In addition to proving the elements of their claims, Plaintiffs must overcome several affirmative defenses pled by Defendant including: (a) that the annuities in question were state-approved and sold by licensed agents; (b) that the forms provided to customers fully and accurately disclosed all material facts and the contracts provided a 30–day "free look" period; (c) that there was no justifiable reliance on statements made by agents that were contradicted by disclosures contained in written materials; (d) that plaintiffs who failed to read or ignored written materials were contributorily negligent; (e) that there is lack of proximate cause of damages; and (f) that Defendant is not liable for the acts of agents who exceeded their authority. (Doc. No. 173).

The proposed settlement has been valued at a minimum of $14.7 million, an estimate which includes only the terms of the General Policy Relief. (Doc. No. 235). To this, any recovery realized by class members through the uncapped Individual Claim Relief process must be added, as well as the incalculable benefits of the non-economic relief. (*Id.*). As for the maximum potential recovery at trial, Plaintiffs' expert, Dr. David J. Nye, estimates that class members could be awarded up to $733.9 million in contract rescission in addition to the return of surrender charges paid by class members, disgorgement of profit and investment income, penalty reimbursement, and damages for emotional distress. (Doc. No. 220, p. 12).

"[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 542 (S.D.Fla. 1988) (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 n. 2 (2d Cir.1974)). The estimated potential recovery reflects the best case scenario in which Plaintiffs would prevail on each and every one of their claims. However, Defendant continues to vigorously deny any liability for wrongdoing based on the allegations in the Third Amended Class Action Complaint. In reality, Plaintiffs face significant risk in taking this litigation to trial where the outcome is uncertain, a fact which weighs in favor of the Court's approval of the settlement.

*Complexity, Expense and Duration of Litigation*

"Particularly in class action suits, there is an overriding public interest in favor of settlement [because it] is common knowledge that class action suits have a well deserved reputation as being most complex." *Cotton,* 559 F.2d at 1331 (citation omitted). In addition to the complexity of the instant case which would likely involve the testimony of numerous experts and presentation of actuarial data and would incur great additional expense, the possible duration of continued litigation through trial and the appellate process when compared with the class members' advanced age persuades the Court that approval of the settlement is warranted as "an efficient and economical procedure for aggrieved Class Members to obtain appropriate relief." *Elkins,* 1998 WL 133741 at *27.

*Adequacy of Notice to Class Members*

"All class members who would be bound by a proposed settlement" must receive reasonable notice. Fed.R.Civ.P. 23(e)(1)(B). The Court-approved Class Notice explained the terms of the proposed settlement and provided a toll-free telephone number by which any class member could obtain additional information about his or her options under the settlement. (Doc. No. 218, Ex. 2, Carlson Decl., Ex. A). Pursuant to Rule 23(c)(2)(B), class members were notified that they were permitted to exclude themselves from the class, and that such election was to be communicated to Defendant by mail postmarked no later than July 24, 2004. (*Id.*). Finally, the Class Notice gave instructions to those class members wishing to remain in the class and also to object to the terms of the proposed settlement agreement, in accordance with Rule 23(e)(4). (*Id.*). No one objecting to the settlement has raised any issue with regard to the sufficiency of notice to class members, and the Court finds that the requirements of Rule 23(c)(2)(B) and (e)(1)(B) have been met.

*Terms of the Settlement; Substance and Amount of Opposition to the Settlement*

"The settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977). In doing so, however, the Court must not forget "that compromise is the essence of a settlement. [It] should not make a proponent of a proposed settlement 'justify each term... against a hypothetical or speculative measure of what concessions might have been gained....' " *Id.* (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)). As the Eleventh Circuit has emphasized, "a just result is often no more than an arbitrary point between competing notions of reasonableness." *Bennett*, 737 F.2d at 987 (quoting *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir.1981)). The Court will evaluate the terms of the settlement described *supra* in connection with the objections made to those terms.

The most substantive objections to the fairness of the proposed settlement come from Beverly Malone, a class member owner of two Index–5 annuities with her own putative class action pending in a Kentucky state court.[3] Malone makes three objections which address each of the substantive components of the settlement agreement, and the Court will address each one in turn.

1. *Scope of Release:*

Malone objects to the language of the Release and Waiver provision of the proposed settlement, arguing that it is too broad in that it releases claims which were not alleged in the Third Amended Class Action Complaint and because it releases individuals and entities who acted as Defendant's agents but who were not parties to the instant litigation and who have not contributed to the settlement.

Briefly, the nature of Malone's allegation in her Kentucky action, filed in 2001 and amended prior to notice of the instant settlement, is as follows. Michael McIntyre,

through his companies Advanced Legal Systems (ALS) and Addison Insurance Marketing, conducts a "trust mill" operation by which elderly individuals are convinced to purchase living trusts with promises that probate and administrative costs may thus be avoided, that the trusts cannot be challenged, that they are appropriate for every consumer, that they are prepared by licensed attorneys, and that there are no disadvantages to such trusts. Malone alleges that the trust she purchased for $1995.00 was an ill-advised product for a person of her age, 75 years old, and that the individuals marketing the trust were non-lawyers who were unqualified to offer such advice. She further alleges that upon her purchase of the living trust, an agent for Addison delivering documents for her signature then persuaded her to purchase two of Defendant's annuities. Malone claims that McIntyre and his companies were agents of Defendant for the purpose of selling equity indexed annuities and that they used their trust mill operation as a way to market those annuities to the target base of elderly consumers. Malone contends that because Defendant contracted with McIntyre, Addison and ALS for the marketing of its annuity products, Defendant was aware of the questionable trust mill operation and that it was being employed to increase annuity sales.

Malone argues that the release provision in the settlement would operate to shield not only Defendant but McIntyre, Addison and ALS, along with the individual agents with whom she dealt, from liability on the claims of the class she seeks to represent relating to the improper use of living trusts in marketing annuities. She claims that 93% of Addison's sales of annuities in 1997 were sold to ALS's living trust clients, a fact of which Defendant allegedly was aware. She argues that the Third Amended Class Action Complaint in the instant case does not include allegations directly related to the use of living trusts as a tool for selling annuities, and therefore, the proposed settlement does not contemplate these claims and insufficiently

---

**3.** *Malone v. Addison Ins. Mktg., Inc.*, Civil Action No. 01–CI–02109, Division 1, Jefferson Circuit Court, Kentucky. (Doc. No. 223).

compensates class members in her particular position. Finally Malone argues that the Court's approval of the settlement would permit McIntyre and his associates, previously admonished by the Federal Trade Commission and various forums in several states for his operation of trust mills,[4] to continue such operation without recourse.

Defendant counters, initially, that Malone overstates the strength of her claims against it and points to excerpts from her deposition and other record evidence from the Kentucky action to address the merits of those claims. For the sake of the class, however, the Court is less interested in determining Malone's individual chances of recovery in her own action should it be permitted to continue to trial than with ascertaining exactly what types of claims and which potential defendants would be released by the terms of the settlement and the propriety of such release.

■ The Court may approve a settlement which releases claims not specifically alleged in the complaint as long as they are based on the same factual predicate as those claims litigated and contemplated by the settlement. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 326 (3d Cir. 1998); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221–22 (5th Cir.1981); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 512 (E.D.N.Y.2003); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F.Supp.2d 561, 577 (E.D.Pa.2001). Malone relies on *Schwartz* to support her argument that the release provision at bar is inappropriately broad. However, the facts of that case are distinguishable. In *Schwartz*, the plaintiff alleged that the bundling of professional football games for distribution specifically via satellite television violated antitrust laws. The court held that a settlement release provision barring any future claims of bundling as to satellite, cable and internet broadcasts was too broad because issues relating to cable and Internet bundling did not arise from the same set of facts. 157

F.Supp.2d at 577. In addition, the court based its disapproval of the release in question on the fact that it would have barred "later claims based on future conduct." *Id.* at 578. There is no such concern in the present case.

■ On the other hand, the Third Circuit affirmed approval of a waiver of claims in a case more analogous to the instant action. In *Prudential*, the complaint against the national provider of life insurance policies alleged a "common course of deceptive conduct" regarding the marketing and sales of its products. 148 F.3d at 325. "The crux of the plaintiffs' complaint was that Prudential engaged in a common scheme of deceptive sales practices. Although the [complaint] specifically lists three types of deceptive sales claims...other allegations address conduct which supports the common scheme theory and which does not fall neatly within the three enumerated categories." *Id.* at 326. Furthermore, although not addressed directly by the appellate court, the release provision which was upheld in *Prudential* contained language which protected not only the company but its agents as well, regardless of their individual contributions to the settlement. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 559 (D.N.J.1997). The district court reasoned that "[a] settlement with Prudential alone would lack finality because if dissatisfied policyholders sued Prudential agents, the agents would likely turn to Prudential for indemnity or contribution." *Id.* Such a result would defeat the purpose of settlement by allowing the "relitigation of settled questions at the core of a class action." *Prudential*, 148 F.3d at 326 n. 82 (citation omitted).

Likewise, the alleged conduct at the heart of the complaint in the instant case consists of a nationwide, company-wide scheme of preying on elderly customers through inadequately trained agents who deceptively induced them to purchase equity indexed annuities. Defendant has represented that the release would serve to bar only those claims relating directly to the marketing and sale of

---

4. These states include New Jersey, Ohio, Pennsylvania, Kansas, and Oregon. (Doc. No. 213, Ex. 8–15).

such annuities. Although some of the defendants in Malone's Kentucky suit are included in the release insofar as they are agents of Defendant for the purpose of selling those products, nothing in the settlement agreement should be interpreted to preclude any claim made by Malone or another class member similarly situated with regard to the marketing, preparation or sale of living trusts. Accordingly, the Court finds that the release and waiver provision contained in the proposed settlement is appropriate.

### 2. *Economic Relief:*

 Malone further objects to the proposed settlement on the grounds that the General Policy relief of immediate annuitization plus 2% enhancement of value has an adverse consequence on holders of Index–5 annuities[5] and that there are inadequate guidelines for those class members who elect to seek Individual Claim Relief.

Malone's objection to the General Policy Relief is based on the existence in Index–5 annuity contracts of a 5% bonus for annuitizing after the tenth year of the contract, and increasing bonuses every year thereafter. She proffers the report of her expert, Dr. Adrian Cowan, who contends that holders of Index–5 policies, approximately 30% of the class,[6] would be better advised to forego the general relief of immediate annuitization plus 2% and wait until the end of their contract periods in order to avail themselves of the 5% (or greater) bonus. (Doc. No. 213, Ex. 17, Cowan Report).

Defendant and Plaintiffs counter that this analysis overlooks the benefit of liquidity that immediate annuitization offers to aging class members, a need which they argue is one of the driving forces behind this class action suit. Plaintiffs turn to the report of their own expert, Dr. Nye, which emphasizes that

"[m]any class members [who were sold an inappropriate product] have a need for immediate income rather than a need to build contract value. . . . The appropriate analysis is to compare what was available to class members under the original contract with what is available under the Stipulation. . . . The Stipulation offers annuitization prior to contract maturity without any surrender penalties and adds a 2 percent bonus to the contract value that is annuitized. This can produce a very significant increase in monthly income to the policy owner—especially in the early contract years where surrender charges [under the contract] are as high as 20 percent."

(Doc. No. 220, Nye Report, p. 8). Furthermore, Nye states that holders of Index–5 annuities who choose not to take advantage of the offered general relief but rather to wait until their contracts mature are not harmed by the terms of the Stipulation. (*Id.* at 9). The Court finds this argument persuasive.

Time is of the essence in this case as most class members are of advanced age and purchased Defendant's annuities on the belief that the policies would provide a steady source of income in their declining years. The concept of the time value of money was never more applicable. Although Cowan suggests that more generous terms might have been advantageous to class members, such as the refund of previously charged surrender fees or compensation for the lost opportunity of investing in higher-return investments (Doc. No. 213, Ex. 17, Cowan Report, pp. 12–15), "inherent in compromise is a yielding of absolutes and an abandoning of

---

5. In her first brief, Malone also argued that the immediate annuitization "over a period of at least ten (10) years and life expectancy" provided insufficient relief, based on her expert's misinterpretation of that term to mean ten years *plus* life expectancy. (Doc. No. 213, Ex. 17, Cowan Report). The parties clarified at the Final Fairness Hearing that the term is to be understood to mean the greater of ten years *or* life expectancy (Doc. No. 232, p. 42), and Malone does not renew this objection in her supplemental brief filed after the hearing.

6. Actually, Cowan's report incorrectly assumes that all of the annuities which are the subject of the settlement include a 5% bonus at the end of the contract period, and she opines that every class member will thus be faced with such a dilemma. (Doc. No. 213, Ex. 17, Cowan Report). In fact, only the Index–5 policies provide such a bonus. (Doc. No. 218, Ex. A, Wingert Decl.).

highest hopes." *Cotton*, 559 F.2d at 1330 (quoting *Milstein*, 57 F.R.D. at 525).

The substance of Robert Kerney's objection to the proposal appears to be that it would not permit him to receive the benefit of the 2% policy value enhancement while taking a lump sum distribution from his policy without paying surrender charges, rather than annuitizing immediately. (Doc. No. 225, Ex. 1). He contends that "for those who do not annuitize, there is no relief." (*Id.*). As Defendant points out, Kerney ignores the possibility of Individual Claim Relief, discussed *infra*, as well as other types of withdrawals permitted under the existing contract. (Doc. No. 218, p. 29, n. 23). Similarly, Maria Burns objects to the settlement solely on the ground that the additional option of transferring existing annuities from Defendant to other companies, free from all surrender charges, should be offered to class members. (Doc. No. 225, Ex. 2).

As stated *supra*, the Court need not consider each and every concession that might have been gained. *See Cotton*, 559 F.2d at 1330. The Court finds that the settlement's General Policy Relief fairly addresses the injuries allegedly suffered by class members despite the absence of these alternatives. However, Malone's point that owners of Index–5 annuities might not fully understand that annuitizing immediately with the 2% value enhancement is effectively a forfeiture of the later 5% bonus provided for in their policies is well taken. Accordingly, Defendant is instructed to include a specific explanation of this information in the required Post–Settlement Notice to class members as required by the Amended Stipulation of Settlement.

With regard to Individual Claim Relief, Malone objects that the proposed settlement gives no guidance to potential claimants as to what types of claims are likely to prevail, does not specify the nature or amount of individual relief that might be awarded or whether punitive damages or attorney's fees are available, and provides no evaluative or scoring criteria on which the Claims Review Panel must base its decisions.

Malone cites little or no authority to support her contention that the Individual Claims Process is insufficient to address the needs of those class members who feel that their individual damages exceed that which the General Policy Relief affords.[7] Plaintiffs and Defendant respond by pointing out that the nature of the possible recovery and scoring criteria are not specified because the intent of the settlement is to provide "any appropriate relief" in light of the highly individual facts involved in a given claim. Additionally, they argue that there is no cap on the amount of individual relief to be awarded, thereby allowing the panel the opportunity to fairly assess the damages suffered and to compensate each claimant accordingly. Finally, the parties argue that punitive damages and attorney's fees are extraordinary types of relief available only in the most extraordinary of circumstances, and that such awards are not required in order to render the settlement fair. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967) (absent a statutory or contractual right, attorney's fees not ordinarily recoverable); *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1075 (11th Cir.2000) (quoting *Cohen v. Office Depot, Inc. [I]*, 184 F.3d 1292, 1295 (11th Cir.1999)) (punitive damages available "only where the egregious wrongdoing of the defendant...constitutes a public wrong"). Given the right of appeal from the panel's decision to the Oversight and Compliance Committee and the availability of mediation and judicial review in the event of a dispute, the Court finds that the Individual Claim Relief afforded in the proposed settlement is fair, adequate and reasonable.

### 3. *Non–Economic Relief:*

The last of Malone's objections takes issue with the non-economic relief described in the Stipulation of Settlement relating to the

---

**7.** Although Malone cites the district court's decision in *Prudential* to illustrate a settlement in which objective criteria were delineated and a scoring system was employed for individual claim review, that case involved a class of approximately eight million class members and settlement terms which the court itself described as "exceptional." 962 F.Supp. at 510, 535. The opinion does not hold that such provisions are prerequisites to a fair and adequate settlement.

training of agents and point-of-sale and post-sale monitoring of sales practices, described *supra*, arguing that this relief is vague and impossible to evaluate. However, each of the terms enumerated in the proposed settlement concerning this non-economic relief is designed to address specific allegations in the complaint that Defendant engaged in deceptive marketing and sales and failed to adequately train its agents, and they are adequate concessions on the part of Defendant in reaching the agreement.

In contrast to the objections raised by Malone and, to a lesser extent, Kerney and Burns, the vast majority of class members have responded positively to the proposed settlement. Out of a class of approximately 23,000 individuals, only thirty-five (0.15 percent) excluded themselves from the class and only three filed objections. This overwhelming support of class members thus weighs heavily in favor of the Court's approval of the settlement. *See Elkins*, 1998 WL 133741 at *28.

*Judgment of Experienced Counsel for the Plaintiff Class*

The Court, "absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330. Class counsel in the instant case are capable attorneys with experience in litigation of this nature. (Doc. No. 221, Hargrove Decl. Ex. A). In addition, there is no evidence of any kind that the parties or their counsel have colluded or otherwise acted in bad faith in arriving at the terms of the proposed settlement. Therefore, counsel's informed recommendation of the agreement is persuasive that approval is appropriate.

*Stage of Proceedings at which Settlement was Achieved*

Finally, the proposed settlement agreement was reached two and a half years after the filing of the original complaint in state court. The parties zealously litigated the case, filed numerous motions, amended pleadings and conducted extensive discovery, all of which activity allowed them the opportunity to consider the relevant facts and applicable legal principles in assessing the strengths and weaknesses of their respective positions. This factor similarly persuades the Court to approve the settlement.

### Conclusion

1. The Amended Stipulation of Settlement (Doc. No. 233) is **APPROVED**. A class as defined in the Amended Stipulation of Settlement is hereby certified, and the Third Amended Class Action Complaint (Doc. No. 155) is **DISMISSED** with prejudice. The Court will retain jurisdiction to enforce the terms of the settlement agreement.

2. The Court reserves ruling on the issue of attorney's fees.

3. Defendant's Motion for Leave to File Reply to Malone's Post–Hearing Filings (Doc. No. 246, filed Oct. 4, 2004) is **DENIED** as moot.