Robbie HILLIS, individually and on behalf of all persons similarly situated, Plaintiff,

v.

EQUIFAX CONSUMER SERVICES, INC. and Fair Isaac, Inc., Defendants.

Civ.A. No. 1:04–CV–3400–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 18, 2006.

Arthur R. Miller, Arthur R. Miller, P.C., Cambridge, MA, Brad N. Friedman, Melvyn I. Weiss, Michael C. Spencer, Milberg Weiss Bershad & Schulman, New York, NY, Charles Neal Pope, Wade H. Tomlinson, III, Pope McGlamry Kilpatrick, Morrison & Norwood, LLP, Columbus, GA, Michael Lee

McGlamry, Pope McGlamry Kilpatrick Morrison & Norwood, Atlanta, GA, for Plaintiff.

Alexander Stephens Clay, IV, Audra Ann Dial, Cindy Dawn Hanson, Craig Edward Bertschi, Kilpatrick Stockton, Atlanta, GA, Kenneth M. Kliebard, Todd L. McLawhorn, Howrey, LLP, Chicago, IL, Samantha M. Rein, Phillip A. Bradley, McKenna Long & Aldridge, Atlanta, Frederick A. Brown, Joel S. Sanders, Rebecca Justice Lazarus, Gibson, Dunn & Crutcher, LLP, San Francisco, CA, for Defendants.

### ORDER

BATTEN, District Judge.

After a thorough review of the parties' briefs, the record evidence, and applicable law, the Court issues the following order on all pending motions in this matter.

## I. Background

### A. Overview

This putative nationwide class action arises from Plaintiff Robbie Hillis's purchase of a service[1] known as "Score Power" from Defendant Equifax Consumer Services, Inc. Plaintiff, on behalf of himself and all others similarly situated, seeks legal and equitable relief arising from Defendants' sale of Score Power and related credit-repair services.[2] Plaintiff alleges that he purchased Score Power to improve his credit score, but after attempting to follow the advice it provided his credit score went down by two points.

Ironically, the fact that Plaintiff's credit score went down is not at the heart of this case. Instead, Plaintiff alleges that in selling Score Power, Defendants failed to comply with various technical requirements that are enumerated in the Credit Repair Organizations Act, 15 U.S.C. § 1679, *et seq.* ("CROA"), and for relief seeks a refund of the amount paid for Score Power by the proposed class.

### B. Defendants and Score Power

Defendant Equifax Consumer Services, Inc. ("Equifax") is a wholly-owned subsidiary of Equifax, Inc. and was formed to sell credit-related services directly to consumers. Equifax Information Services LLC ("EIS"), another subsidiary of Equifax, Inc., is one of the three national credit reporting agencies and is responsible for gathering and maintaining credit reports on U.S. consumers.

Defendant Fair Isaac, Inc. is the creator of the FICO score, a three-digit number ranging from 300 to 850 that represents an estimate of a consumer's creditworthiness. The FICO score was designed to give lenders a quick measurement of a consumer's credit risk. Fair Isaac is not a credit bureau, but licenses credit bureaus and other entities to generate and display FICO scores that are calculated using information on a consumer's credit report.

Until late 2000, FICO scores were not available for sale directly to consumers. Instead, FICO scores were available only through lenders. Consumer advocates and various government authorities encouraged Fair Isaac to make FICO scores available directly to the public and to explain how the FICO score works and how consumers may take steps to improve their scores. Among other things, Fair Isaac launched its website, *www.myFICO.com,* which offers information and services, both for free and for a fee, to assist consumers to better understand their FICO scores and the factors that go into those scores.

In 2001, capitalizing on their respective areas of expertise, Equifax and Fair Isaac teamed up to sell Score Power to consumers. On February 21, 2001, Fair Isaac and Equifax entered into an agreement in which they

---

1. The parties are in disagreement as to whether Score Power is a "service" within the meaning of § 1679(a)(3) of the Credit Repair Organizations Act, 15 U.S.C. § 1679, *et seq.* ("CROA") or is instead a product, which would exempt Defendants from the definition of a "credit repair organization." For the reasons discussed in Part III.C. of this order, the Court concludes that Score Power is a service.

2. Equifax and Fair Isaac also developed and marketed other services to consumers in which "Score Power" was a component. These Score Power-related services are also part of Plaintiff's proposed class.

arranged to market and sell Score Power on *www.myFICO.com* and *www.equifax.com.*

Score Power was first offered to the public on March 19, 2001. Between March 2001 and May 2005, approximately eight-million Score Power units have been sold. Score Power has been well received by consumer advocates and news organizations, and has received high marks in consumer satisfaction surveys. The cost of Score Power is $14.95.

Score Power consists of an Equifax credit report, a FICO score based upon that credit report, an explanation of the primary factors that affected the credit score, and since 2002, access to a FICO score simulator that allows consumers to see how certain actions such as paying down outstanding debt, filing for bankruptcy, or paying bills late may affect their credit scores over time.

## C. Events Leading to This Lawsuit

On November 13, 2003, Plaintiff purchased Score Power from Equifax's website, *www. equifax.com.* Plaintiff never had any credit problems or credit issues, nor had he ever been denied credit. He testified that he purchased products from Equifax in the past and therefore purchased Score Power from Equifax because of brand loyalty. Prior to making the purchase, Plaintiff spent approximately forty-five minutes on *www.equifax. com.* When asked in his deposition whether he "knew everything [he] needed to know about Score Power before [he] decided to buy it for the first time," Plaintiff answered affirmatively.

After inputting his credit card information and being charged $14.95, Plaintiff received a Score Power report that showed his FICO score to be 696. Plaintiff returned to Equifax's website to purchase Score Power on four other occasions: February 24, 2004; April 27, 2004; June 11, 2004; and August 13, 2004. With each purchase, he received his FICO score, a credit report, access to the FICO score simulator, and the explanation— just as he had with his first purchase. Plain-

tiff did not visit *www.myFICO.com* to purchase Score Power.

Plaintiff claims that he took actions based on information he received from Score Power, such as closing certain accounts, but that his FICO score did not improve. Specifically, Plaintiff points out that his FICO score was 696 on November 13, 2003, but by August 13, 2004, had dropped two points to 694.

Shortly after Plaintiff's fifth and final purchase, Score Power came up in casual conversation with Plaintiff's best friend, Jeff Cottoney, who happens to be a lawyer. Plaintiff entered into a retainer agreement with Cottoney, who then sought the services of Pope, McGlamry, Kilpatrick, Morrison, and Norwood LLP to file this putative class action. Prior to filing suit, Plaintiff never contacted Equifax or Fair Isaac to complain about Score Power, nor did he request a refund.

## D. Plaintiff's Complaint

On November 19, 2004, Plaintiff filed this putative nationwide class action. In his Complaint, Plaintiff, on behalf of himself and all others similarly situated, seeks legal and equitable relief arising from Defendants' sale of Score Power and related credit-repair services.

Specifically, Plaintiff contends that Defendants are "credit repair organizations" within the meaning of § 1679a(3) of the CROA and that they violated the CROA's "statutory safeguard" provisions by: (1) charging for credit repair services prior to fully performing such services in violation of 15 U.S.C. § 1679b(b); (2) failing to provide adequate written disclosures in violation of 15 U.S.C. § 1679c; (3) failing to enter into written contracts in violation in 15 U.S.C. § 1679d; and (4) failing to provide written notices of cancellation rights in violation of 15 U.S.C. § 1679e. Plaintiff also contends that Defendants made untrue or misleading representations regarding their credit repair services in violation of 15 U.S.C. § 1679b(a)(3).[3] Final-

---

**3.** Unlike Plaintiff's CROA statutory safeguard claims, Plaintiff's claim under 15 U.S.C. § 1679b(a)(3) does not require Plaintiff to prove that Defendants are "credit repair organizations" because that provision of the statute applies to

"any person." *See e.g., Helms v. Consumerinfo.Com, Inc.,* 436 F.Supp.2d 1220 (N.D.Ala. 2005); *Parker v. 1–800 Bar None,* No. 01 C 4488, 2002 WL 215530, at \*5 (N.D.Ill. Feb. 12, 2002); *FTC v. Gill,* 265 F.3d 944, 955 (9th Cir.2001);

ly, Plaintiff asserts a state law claim for unjust enrichment.[4]

On behalf of the class, Plaintiff seeks damages pursuant to 15 U.S.C. § 1679g(a)(1)(B) in an amount equal to all monies paid to Defendants for the Score Power services at issue (an amount that may exceed $200 million), as well as punitive damages pursuant to 15 U.S.C. § 1679g(a)(2)(B).

### E. Applicability of the CROA and Sequence of Motions

Defendants readily concede that they have not complied with the statutory safeguard provisions of the CROA—they acknowledge that Plaintiff did not receive any of the written disclosures, contracts, or notices of cancellation rights. Defendants argue, however, that they are not subject to these requirements because they are not "credit repair organizations" within the meaning of the CROA.

Recognizing the importance of whether Defendants are within the purview of the CROA, Plaintiff has filed a motion for partial summary judgment, in which he argues that the Court should find as a matter of law that Defendants are credit repair organizations within the meaning of the CROA. Defendants have not filed a cross-motion for partial summary judgment on this issue, but instead counter that genuine issues of material fact preclude the Court from resolving the applicability of the CROA as a matter of law.

The Court is mindful of the significance of the issues raised in Plaintiff's motion for partial summary judgment, namely the scope and applicability of the CROA, and therefore the Court addresses the merits of Plaintiff's motion in Part III of this order. Although Defendants object to this approach, the Court has discretion to manage its docket and determine the sequence of motions. *See*

*United States v. McCutcheon,* 86 F.3d 187, 190 (11th Cir.1996); *see also* 3 *Alba Conte & Herbert B. Newberg, Newberg on Class Actions* § 7:15 (2006) (explaining that class certification rulings may be made simultaneously with the disposition of other motions).

And in exercising this discretion, the Court finds that principles of judicial economy strongly weigh in favor of a ruling that encompasses all motions in this case. Most importantly, taking this approach will facilitate any appellate review that may ensue. *See Wagner v. Daewoo Heavy Indus. Am. Corp.,* 314 F.3d 541, 543 (11th Cir.2002) ("[p]iecemeal appellate review has a deleterious effect on judicial administration. It increases the workload of the appellate courts, to the detriment of litigants and judges"). Thus, the Court denies Defendants' motion to stay consideration of Plaintiff's motion for partial summary judgment.

### II. Class Action Analysis

Having set forth the background facts and posture of this case, the Court now moves on to consider the threshold procedural question of whether this case should proceed as a class action.

### A. Legal Standard

The Supreme Court has stated that "[t]he class action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only ...'" and is only appropriate where the "device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (citations omitted).

---

*Bigalke v. Creditrust Corp.,* 162 F.Supp.2d 996, 999 (N.D.Ill.2001). Additionally, originally Plaintiff also alleged a fraud claim pursuant to 15 U.S.C. § 1679b(a)(4), which also broadly applies to "any person." However, Plaintiff does not seek certification of the class with respect to this claim, and the Court finds that Plaintiff has abandoned this claim, both individually and on behalf of the class.

4. Although Plaintiff moves for class certification on his unjust enrichment claim, he never identifies the elements of that claim and offers no argument as to how it meets the requirements of Fed.R.Civ.P. 23. Thus, Plaintiff has failed to carry his burden of showing how the unjust enrichment claim meets the requirements of Fed. R.Civ.P. 23, and the Court denies Plaintiff's request for class certification on this claim.

It is well settled that to maintain this case as a class action, Plaintiff must satisfy each of the prerequisites of Fed.R.Civ.P. 23(a) and at least one of the provisions of Fed.R.Civ.P. 23(b). *Klay v. Humana, Inc.,* 382 F.3d 1241, 1250 (11th Cir.2004). Rule 23(a) sets forth four requirements that must be met before a case can proceed as a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Courts commonly refer to the Rule 23(a) prerequisites as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Cooper v. S. Co.,* 390 F.3d 695, 711 n. 6 (11th Cir.2004). Failure to establish any one of the four requirements precludes certification.

In an effort to satisfy the Rule 23(b) requirement, Plaintiff proceeds under Fed. R.Civ.P. 23(b)(3), which considers (1) whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." These are often referred to as the predominance and superiority requirements.

Importantly, Plaintiff, as the party seeking class certification, bears the burden of proving that all of the applicable Rule 23 requirements have been met. *See Falcon,* 457 U.S. at 161, 102 S.Ct. 2364; *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1187 (11th Cir.2003). And the decision to grant or deny class certification lies within the sound discretion of the district court. *Klay,* 382

F.3d at 1251; *Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374, 1386 (11th Cir.1998) (en banc).

When considering the propriety of class certification, the Eleventh Circuit has instructed that "[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co.,* 350 F.3d at 1188 n. 15. In doing so, the Court may look beyond the pleadings to determine if certification is appropriate. *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364.

## B. Analysis

### 1. Proposed Class

Pursuant to Rule 23(a) and 23(b)(3), Plaintiff requests that the Court certify the following class:

> All persons in the United States who, from five (5) years prior to the filing of his action to the date of final judgment in this action, have paid Equifax Consumer Services, Inc. and/or Fair Isaac Corporation any sum of money in advance (whether directly or through any partner or affiliate) for any of the following services, and any derivation thereof: Score Power, Score Power Subscription/Pack; Score Watch; 3-in-1 with Score Power; Credit Advantage; any version of Credit Watch that included Score Power as a component; and any version of the Suze Orman FICO Kit that included Score Power as a component.[5]

### 2. Rule 23(a) Requirements

#### (a) Numerosity

Pursuant to Fed.R.Civ.P. 23(a)(1), the numerosity requirement is satisfied if the proposed class is "so numerous that joinder of

---

**5.** Excluded from the class definition are all judicial officers in the United States and their families through the third degree of relationship; Defendants and any of their officers, directors, and employees, and any persons or entities who have already settled or otherwise compromised their claims against the defendants; any person who

before final judgment has filed any bankruptcy proceeding; and anyone who has pending against the named Defendants on the date of this Court's class certification order any individual action wherein the recovery sought is based in whole or in part on the type of claims asserted herein.

all members is impracticable." "Impracticable" does not mean impossible. *Rhodes v. Cracker Barrel Old Country Store, Inc.,* 213 F.R.D. 619, 674 (N.D.Ga.2003). Rather, Plaintiff "need only show that it would be extremely difficult or inconvenient to join all members of the class." *In re Miller Indus., Inc. Secs. Litig.,* 186 F.R.D. 680, 685 (N.D.Ga.1999). The size of the class, the geographical dispersion of the class, the ease of class member identification, the nature of the action, and the size of each class member's claim affect the practicability of joinder of the class members. *Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 666 (N.D.Ga.2001).

The proposed class would include all persons who purchased Score Power within the past five years. Defendants acknowledge that the potential number of class members may exceed one million. Therefore, the Court finds that the numerosity requirement is met.

### (b) Commonality

■ To satisfy the commonality requirement, Plaintiff must show that there are questions of law or fact common to the entire class. Fed.R.Civ.P. 23(a)(2). It is not necessary that all questions of law and fact be common. *See Nat'l Broadcasting Co. v. Cleland,* 697 F.Supp. 1204, 1216 (N.D.Ga.1988); *Strube v. Am. Equity Inv. Life Ins. Co.,* 226 F.R.D. 688, 695 (M.D.Fla.2005); *see also Newberg on Class Actions,* § 3:10 (explaining that the Rule 23(a)(2) "prerequisite is qualitative rather than quantitative; ... there need be only a single issue common to all members of the class").

Defendants concede that Plaintiff satisfies the commonality requirement. In any event, the Court finds that the commonality requirement is met because questions common to the class will include *inter alia* whether Defendants are credit repair organizations subject to the CROA and whether Defendants made untrue or misleading representations in violation of the CROA.

### (c) Typicality

For a plaintiff to meet Rule 23(a)(3)'s typicality requirement, "[a] class representative must possess the same interest and suffer the same injury as the class members...." *Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir.2001). "[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000).

### (i) Claims Against Fair Isaac

■ Fair Isaac argues that Plaintiff cannot satisfy the typicality requirement with respect to the claims against it because Plaintiff never accessed Fair Isaac's website, *www.myFICO.com,* and never purchased anything from Fair Isaac, yet Plaintiff's proposed class includes individuals who purchased Score Power from Fair Isaac. In response, Plaintiff contends that it is immaterial that he did not purchase anything from Fair Isaac because Defendants are jointly liable for the conduct of each other because they were joint venturers.

The Court is persuaded that Plaintiff's claims against Fair Isaac may go forward notwithstanding the fact that Plaintiff did not purchase Score Power from Fair Isaac. It is undisputed that Fair Isaac and Equifax sold the same Score Power service and that Equifax and Fair Isaac began marketing and selling Score Power in 2001 pursuant to a formal agreement known as the "Score Power Agreement." That agreement provides for the parties' joint responsibilities with respect to the development, marketing, and sale of Score Power. Pursuant to the agreement, Fair Isaac and Equifax agreed to share revenues from sales of Score Power.

Accordingly, Plaintiff has demonstrated a sufficient interrelationship between his claims and Defendants' conduct such that Plaintiff can bring claims against Fair Isaac. *See Newberg on Class Actions* § 3:18 (2006) (explaining that typicality may be satisfied although plaintiff has had no business contact with one of the defendants upon a showing of a sufficient interrelationship between the defendants and the grievance of the plaintiff).

### (ii) Plaintiff's Statutory Safeguard Claims (15 U.S.C. §§ 1679b(b), 1679c, 1679d, & 1679e)

With regard to Plaintiff's statutory safeguard claims, Defendants do not challenge

Plaintiff's ability to meet the typicality requirement. The gist of Plaintiff's argument is that Defendants violated the CROA by not complying with the various statutory safeguard requirements, including the requirements that Defendants provide written disclosures, contracts, and notices of cancellation rights. Defendants admit they did not comply. Thus, if Defendants are subject to the CROA, they have admittedly violated the disclosure requirements with respect to Plaintiff and all members of the class, thereby making Plaintiff typical. The Court finds that Plaintiff meets the typicality requirement with respect to his statutory safeguard claims.

### (iii) Plaintiff's Claims under 15 U.S.C. § 1679b(a)(3) of the CROA

■ Defendants do, however, challenge Plaintiff's ability to satisfy the typicality requirement with respect to his claims under 15 U.S.C. § 1679b(a)(3) of the CROA. Pursuant to 15 U.S.C. § 1679b(a)(3), Plaintiff contends that Defendants made misleading or untrue representations regarding Score Power. Among other things, Plaintiff contends that Defendants misrepresented that Score Power could improve a person's credit and provided personalized tips, knowing it did not do these things.

To meet the typicality requirement for these claims, Defendants argue that Plaintiff, at a minimum, must show that he saw or heard the allegedly untrue or misleading representations that are set forth in his Complaint. Defendants point out, however, that Plaintiff's deposition testimony reveals that he did not see or cannot recall seeing virtually any of the representations. Defendants assert that this deficiency demonstrates that Plaintiff is not "typical" because he will be unable to prove the claims of absent class members who saw different representations.

Plaintiff urges that Defendants' position is no more than a back-door attempt to insert the element of reliance into the CROA, pointing out that at least one court has concluded that 15 U.S.C. § 1679b(a)(3) does not require any showing of individual reliance. *See Helms v. Consumerinfo.com, Inc.,* 436 F.Supp.2d 1220, 1235–36 (N.D.Ala.2005). Relying on *Helms,* Plaintiff argues that 15 U.S.C. § 1679b(a)(3) merely requires a showing that Defendants, in general, made misleading or untrue statements.

The essence of Plaintiff's position is that he does not need to establish that he saw or heard *any* representations to meet the typicality requirement. According to Plaintiff, once a defendant makes a misleading statement, liability attaches without regard to whether a plaintiff saw or heard the statement.

Plaintiff's position raises profound standing concerns.[6] The Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." U.S. Const., Art. III § 2. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff who invokes the jurisdiction of a federal court bears the burden of showing (1) an injury in fact, meaning an injury that is concrete and particularized, and actual and imminent, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *Tanner Adver. Group, L.L.C. v. Fayette County,* 451 F.3d 777, 790 (11th Cir.2006) (en banc) (citations and quotation marks omitted). Each of these elements is "an indispensable part of the plaintiff's case" and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

---

6. Additionally, Plaintiff's request for punitive damages undercuts his argument that a plaintiff need not show that he saw any of the representations at issue. The CROA provides that in determining the amount of punitive damages to award, "the court shall consider, among other relevant factors-(1) the frequency and persistence of noncompliance by the credit repair organization; (2) the nature of the noncompliance; (3)

the extent to which such noncompliance was intentional; and (4) in the case of any class action, the number of consumers adversely affected." 15 U.S.C. § 1679g(b). Without a class representative who has actually seen at least some of the alleged misrepresentations, there is no way a court could determine what punitive damages, if any, to award.

i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

In the class action context, the Eleventh Circuit has instructed that "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado–Steiman,* 221 F.3d at 1279–80; *see also Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (explaining that "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent").

If Plaintiff could not recall seeing or hearing *any* of the representations that are cited in his Complaint, the Court would have serious concerns regarding Plaintiff's ability to show an injury-in-fact sufficient to allow him to maintain a cause of action under 15 U.S.C. § 1679b(a)(3).[7] In other words, if there was no evidence that Plaintiff saw or heard any of the representations alleged, there would be no injury to him, regardless of whether the representations may have been misleading or untrue to others.

Although Plaintiff's deposition testimony plainly reveals that he cannot recall most of the representations that are at issue, his testimony does indicate that he saw at least some of the representations. Thus, Plaintiff has standing to assert a claim under 15 U.S.C. § 1679b(a)(3).

Nonetheless, Plaintiff's inability to recall most of the representations that are alleged in his Complaint does prove fatal to his ability to satisfy the typicality requirement for his claims under 15 U.S.C. § 1679b(a)(3). Even assuming that Plaintiff is correct and individual reliance is not required to maintain a claim under 15 U.S.C. § 1679b(a)(3), the Court rejects the notion that Plaintiff can satisfy the typicality requirement without a stronger showing that he was exposed to the representations that form the basis of the proposed class's claim that Defendants made untrue or misleading representations in violation of 15 U.S.C. § 1679b(a)(3).

The Sixth Circuit has summed up the typicality requirement as follows: "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998). Typicality cannot be satisfied when a "named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Id.* Here, that is likely to occur.

At best, at the end of Plaintiff's case, he will only be able to prove that the representations he saw or heard were misleading or untrue. He will be unable to prove the claims of absent class members who saw different representations. Therefore, under these circumstances, Plaintiff fails to meet the typicality requirement. *Cf. Dalton v. FMA Enters., Inc.,* No. 95–396–CIV–FTM–17D, 1996 WL 379105, at *5 (M.D.Fla. July 1, 1996) (in a Fair Debt Collection Practices Act ("FDCPA") case, court found plaintiff was not typical where he failed to establish which members of the potential class received which letters at issue); *Byes v. Telecheck Recovery Servs., Inc.,* 173 F.R.D. 421, 425 (E.D.La.1997) (in FDCPA case, court found plaintiff was not typical where different class members received different letters).

#### (d) Adequacy of representation

■ Under Fed.R.Civ.P. 23(a)(4), Plaintiff must show that, as a class representative, he will fairly and adequately protect the interests of the class. *London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246, 1253 (11th Cir. 2003). This requirement applies to both the named plaintiff and class counsel. *Amchem*

---

7. Indeed, if a case were to proceed under these circumstances, such a result would effectively allow a private citizen to bring an enforcement proceeding, which is within the sole domain of the FTC. *Cf. Equifax Inc. v. FTC,* 678 F.2d 1047, 1051 (11th Cir.1982), in which the FTC argued that "whereas a private plaintiff necessarily must prove injury to recover damages, the Commission may act to enjoin a practice posing a risk of harm to consumers before that harm actually occurs .... [T]he meaning and legislative history of the section establish the Commission's prophylactic enforcement role."

*Prods., Inc. v. Windsor,* 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

To determine whether Plaintiff has satisfied the adequacy of representation requirement, the Court engages in a two-part inquiry of: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.,* 350 F.3d at 1189.

The Court has no doubt that Plaintiff's counsel is adequate, and Defendants do not argue otherwise. Defendants do, however, challenge Plaintiff's ability to satisfy the adequacy of representation requirement, arguing that (1) Plaintiff's claims are in conflict with class members who benefited from Score Power; (2) Plaintiff has abandoned the prosecution of his claims to his attorneys; and (3) Plaintiff is not sufficiently familiar with his claims.

First, Defendants argue that Plaintiff's interests are in conflict with some members of the proposed class because Plaintiff claims to have been harmed by the same conduct that benefited other members of the class. The Eleventh Circuit has explained that:

> A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefited other members of the class. In such a situation, the named representatives cannot vigorously prosecute the interests of the class through qualified counsel because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.

*Valley Drug Co.,* 350 F.3d at 1189; *see also Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir.2000) ("a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class").

Defendants argue that a fundamental conflict exists because some consumers received a net benefit from their purchase of Score Power. According to Defendants, some con-

sumers who purchased Score Power may have experienced an increase in their FICO score or at the very least information that had value. Even assuming that this is true, it is insufficient to rise to the level of a fundamental conflict between Plaintiff and some members of the class.

■ Moreover, Defendants' ability to assert this argument depends upon their having a viable set-off defense. The problem for Defendants is that they failed to plead the defense of set-off in their answers. Mindful of this, Defendants move the Court pursuant to Fed.R.Civ.P. 15(a) for leave to amend their answers to assert five new defenses, including set-off.

For two reasons, the Court denies Defendants' motion. First, the Court finds that Defendants waited too long to file this motion. Although Fed.R.Civ.P. 15(a) instructs that "leave shall be freely given when justice so requires," one factor militating against granting leave to amend is when a party unnecessarily delays in making the request. *Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.,* 984 F.2d 1118, 1124 (11th Cir.1993); *see also Foman v. Davis,* 371 U.S. 178, 183, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Here, Defendants unnecessarily delayed in filing their motion. They sought leave to amend their answers almost three weeks after Plaintiff filed his motion for class certification and approximately six weeks after the close of discovery. Moreover, Defendants' motion was untimely under the Preliminary Report and Discovery Schedule, which required amendments to be offered by March 14, 2005.

The Court agrees with Plaintiff that it would prejudicial to him at this point in the litigation to permit Defendants to amend their answers and inject additional issues that may require additional discovery,[8] further delaying this case.

Second, the Court finds that it would be futile to grant Defendants' motion for leave to amend. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227 (futility of the amendment is a

---

8. For example, Plaintiff would need to conduct discovery and gather evidence bearing on the value of the services to the class members.

factor the Court may consider). Just because some consumers may have received "value" does not mean they received a net benefit as contemplated by the CROA. Nowhere does the CROA provide that a credit repair organization that violates the act may be entitled to a set-off. Nor does the nature of the statute's prescribed damages suggest that the CROA permits such a defense. The damages provision of the CROA is plain and unambiguous, and it does not allow for or contemplate any set-off. If Defendants are subject to but failed to comply with the CROA, any consumer who purchased Score Power is entitled to a refund of the money he paid to Defendants without having to reduce that refund by any "value" he may have received. Finally, computing the value of a purchaser's benefit would be difficult if not impossible. For all of these reasons, the Court denies Defendants' motion for leave to amend their answers.[9]

■ In further support of Defendants' argument that Plaintiff cannot meet the adequacy of representation requirement, they contend that Plaintiff has abandoned prosecution of his claims to his attorneys. The Eleventh Circuit has explained that a class representative cannot abdicate his role as representative to class counsel. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726–28 (11th Cir.1987) (a "potential class is entitled to more than blind reliance upon even competent counsel by interested and inexperienced representatives").

Defendants point out that during his deposition, Plaintiff stated that after meeting with the attorneys of Pope, McGlamry, Kilpatrick, Morrison & Norwood, he "pretty much hand[ed] the matter off" to his attorneys. Standing alone, this is insufficient to demonstrate that Plaintiff has abdicated his role as class representative. The fact that Plaintiff lets his lawyers handle the day-to-day management of his case is not surprising and, in fact, is customary and expected.

Defendants also claim that there is too close of a relationship between Plaintiff and one of his attorneys. In particular, in his deposition, Plaintiff testified that he first retained Mr. Cottoney, one of his best friends, to represent him in connection with this lawsuit. After signing an agreement with Plaintiff, Cottoney then sought the services of Pope, McGlamry, Kilpatrick, Morrison & Norwood.

The Court is mindful that the Eleventh Circuit has recognized that when a class representative shares a close personal relationship with an attorney involved in the class litigation, the class representative's interests may be more closely associated with his attorney friend than the absent class members when considering settlement. *See London*, 340 F.3d at 1254–55.

However, Mr. Cottoney does not appear on the pleadings in this case, and he is not class counsel. Nevertheless, the Court is somewhat concerned by Plaintiff's relationship with Cottoney given that Cottoney may have a stake in this case. However, unlike the situation in *London*, here there is not enough evidence for the Court to conclude that Plaintiff's interests are more closely associated with Mr. Cottoney than they are with the absent class members.

Finally, Defendants contend that Plaintiff cannot satisfy the adequacy of representation requirement because his deposition testimony reveals that he lacks familiarity with the allegations in this case. Defendants' argument in this regard focuses on Plaintiff's lack

---

**9.** The Court also denies Defendants' motion for an extension of time to file a motion for partial summary judgment. Defendants seek to file an untimely motion for partial summary judgment motion in which they mount a constitutional challenge to the damages provisions of the CROA. First, the Court denies the motion because it untimely. Pursuant to the Joint Preliminary Report and Discovery Plan filed by the parties, summary judgment motions were due to be filed within twenty days after the close of discovery, and Defendants missed this deadline. Second, even if the Court considered the motion, a review of the motion reveals that it hinges on Defendants' ability to amend their answers to include additional constitutional defenses. Thus, the Court's denial of Defendants' motion to amend their answers renders Defendants' motion for partial summary judgment moot. Finally, Defendants' motion is moot in light of the Court's ultimate decision to deny class certification, thereby removing any due process concerns regarding the damages that could be recovered in this case.

of familiarity with the facts that pertain to his claims under 15 U.S.C. § 1679b(a)(3).

Upon a thorough review of Plaintiff's deposition testimony, the Court agrees with Defendants and finds that Plaintiff is not an adequate class representative with respect to his claims under § 1679b(a)(3). Although Plaintiff is sufficiently familiar with the general nature of this lawsuit, he is unfamiliar with many of the specific allegations that form the basis for the claims under 15 U.S.C. § 1679b(a)(3). Indeed, as shown below, Plaintiff's deposition testimony establishes that he has never seen or cannot recall having seen virtually any of the representations that are enumerated in his Complaint and that form the basis of the claims under 15 U.S.C. § 1679b(a)(3).

For example, Plaintiff's Complaint alleges that Defendants failed to adequately disclose that although he had access to the credit score and credit report for thirty days following a purchase of Score Power, the credit score and credit report are not updated during that period. However, in his deposition, Plaintiff testified that before he purchased Score Power, he fully understood that the information he would receive was "stagnant" and would not update.

The Complaint also alleges that Defendants represent to consumers such as Plaintiff that a purchaser will be able to make or plan adjustments to the accounts shown on his credit report so as to improve his credit score. However, in his deposition, Plaintiff testified that he does not recall ever seeing a representation to that effect.

Furthermore, Plaintiff devotes an entire section of his brief in support of class certification discussing various statements disseminated by Defendants that are allegedly misleading or untrue. Plaintiff also alleges that Defendants utilize misleading or untrue metatags, key words, and links on third-party websites.

However, in his deposition, Plaintiff testified repeatedly that he cannot recall ever seeing or hearing an advertisement for Score Power. Plaintiff states that he may have received "an email" from Equifax, but he cannot recall anything specific about the content nor does he have a copy of it. Further, Plaintiff did not use a search engine to access www.equifax.com, and there is no evidence that he reached the website by clicking on a link of a third-party website.

With regard to the content of the representations that are alleged, Plaintiff argues that Defendants made multiple and widespread representations regarding "improving credit," "managing credit," and "personalized tips." Plaintiff implies that virtually every prospective purchaser of Score Power must have seen such representations and that they are misleading or untrue.

However, Plaintiff testified that he has no recollection of seeing any statements that Score Power would improve his credit score and no clear recollection of seeing the word "manage" in connection with Score Power. Moreover, when asked if Score Power helped consumers manage their credit, Plaintiff said that it did. Finally, Plaintiff admits that he did in fact receive personalized tips when he purchased Score Power.

These inconsistencies illustrate that Plaintiff either contradicts or is unfamiliar with most of the allegations that form the basis for his claims under 15 U.S.C. § 1679b(a)(3). Under the circumstances, the Court has serious concerns about the interests of the absent class members who would be bound by any judgment in this case. As this Court noted in *Cooper v. Southern Co.*, 205 F.R.D. 596, 608–09 (N.D.Ga.1996) (Evans, J.):

> While it is relatively simple to evaluate the merits of a dispute involving one plaintiff and one defendant, fairness to both sides in a class action is a far greater challenge and places considerable responsibility on the Court. If a class representative with a weak case loses and individual class members with strong cases are bound by the negative outcome, an injustice will have occurred. Similarly, if a winning class representative's claim and the class member claims are dissimilar, it may be unjust for the opposing party (usually the Defendant) to be responsible for the claims of class members. The Court's responsibility is to make sure that the common bond between the class representatives' claims and those of the class is strong enough so that it is

fair for the fortunes of the class members to rise or fall with the fortunes of the class representatives.

If this case went to trial, to prevail under 15 U.S.C. § 1679b(a)(3), Plaintiff would bear the burden of proving that Defendants' representations were misleading or untrue. Even if the Court applied an objective standard to these claims (i.e., a standard of the least sophisticated consumer or reasonable consumer), the trier of fact would no doubt be influenced by whether Plaintiff believed the representations were misleading. As explained above, Plaintiff's ability to recall and discuss the representations at issue is hazy at best. And as go the Plaintiff's claims, so go the claims of potentially a million other individuals. Plaintiff seeks to represent the interests of as many as one million people with aggregate claims in excess of $200 million. Under these circumstances, the Court has serious concerns as to whether the claims of so many should rise or fall with this particular Plaintiff.

For these reasons, the Court finds that Plaintiff does not satisfy the adequacy of representation requirement, at least with respect to his claims under 15 U.S.C. § 1679b(a)(3).

### 3. Rule 23(b)(3) Requirements

As explained earlier, under Fed.R.Civ.P. 23(b)(3), the Court next must consider whether (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

### (a) Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Rutstein v. Avis Rent–A–Car Sys.,* 211 F.3d 1228, 1234 (11th Cir.2000). To satisfy the predominance requirement, Plaintiff must establish that "the

issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are subject only to individualized proof." *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997) (citations and quotation marks omitted). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Klay,* 382 F.3d at 1255.

### (i) Plaintiff's Statutory Safeguard Claims (15 U.S.C. §§ 1679b(b), 1679c, 1679d, & 1679e)

With regard to his statutory safeguard claims, Plaintiff satisfies the predominance requirement for largely the same reasons that he satisfies the commonality and typicality requirements on these claims. Because Defendants concede that they did not comply with the statutory safeguard provisions of the CROA, the main question is whether each class member purchased a service from Defendants. Once this determination is made, few individual determinations will remain. *See Helms v. Consumerinfo.com, Inc.,* 236 F.R.D. 561, 566–67 (N.D.Ala.2005) (reaching same conclusion).

### (ii) Plaintiff's Claims under 15 U.S.C. § 1679b(a)(3) of the CROA

With regard to his claims for misleading representations under 15 U.S.C. § 1679b(a)(3), the Court finds that Plaintiff cannot satisfy the predominance requirement for many of the same reasons that he fails to meet the typicality requirement for these claims. Plaintiff's proposed class creates numerous individual issues that predominate over any common issues of fact and law.

In particular, members of the proposed class saw two different websites, *www. equifax.com* and *www.myFICO.com,* and each class member's experience with the website is likely to differ significantly.

Plaintiff claims that these differences should be overlooked because Defendants made common and uniform misrepresentations regarding what services they would provide. However, Plaintiff has not adequately demonstrated that Defendants' alleged misrepresentations were uniform with respect to the class. Indeed, Plaintiff's own testimony is the best evidence demonstrating that the representations were not uniform.

For example, Plaintiff cites to text from the websites to demonstrate that Defendants uniformly stated that they would "improve" credit scores and provide "personalized tips" when Defendants knew that they would not provide this. However, Plaintiff recalls no specific representations during his repeated visits to *www.equifax.com* to the effect that by purchasing Score Power, he could improve or change his credit history, rating or score.

Plaintiff's experience with *www.equifax. com* illustrates that the individual experience of each member of the proposed class will differ widely. Putative class members could have accessed one or possibly both *www. equifax.com* and *www.myFICO.com* and could have accessed the sites through hundreds of possible marketing affiliates. What they saw when they accessed those websites will depend on many things, including the time period in which they accessed the website, what pages they saw, and which website they accessed. Also, because members of the class likely accessed different parts of a particular website, it will be very difficult to determine on a class-wide basis what representations they saw or read. Moreover, determining whether each particular representation was misleading or untrue in violation of the CROA would further require the Court to engage in a highly individualized inquiry.

For these reasons, Plaintiff has failed to show that common issues of fact or law predominate with respect to his claims under 15 U.S.C. § 1679b(a)(3). *See Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1364 (11th Cir.2002) (in case involving allegedly deceptive advertisements, court found that predominance requirement was not met where, among other things, advertisements varied widely); *Solo-mon v. Bell Atl. Corp.*, 9 A.D.3d 49, 777 N.Y.S.2d 50, 55 (N.Y.App.Div.2004) (class certification is inappropriate where the "plaintiffs do not point to any specific advertisement or public pronouncement by the [defendants] which was undoubtedly seen by all class members").

### (b) Superiority

■ The superiority requirement in Fed. R.Civ.P. 23(b)(3) directs the Court's attention to "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d 1241, 1269 (11th Cir. 2004). The superiority requirement is grounded in the idea that the litigation is to be carried out as efficiently and as fairly as possible for *all* parties. *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231 (emphasis added).

In determining whether a plaintiff has satisfied the superiority requirement, the Eleventh Circuit has instructed that a district court may consider the defendant's conduct and the harm to the class in relation to the potential damages that are sought. *See Klay*, 382 F.3d at 1271. The Eleventh Circuit explained this as follows:

There are also several reasons courts commonly cite as to why it is particularly undesirable to litigate a class's claims in a single judicial forum. Perhaps most importantly, we assess whether the potential damages available in a class action are grossly disproportionate to the conduct at issue. Where the defendant's alleged behavior is deliberate or intentional, we have had no problem allowing class actions to proceed. Where defendants are being sued for statutory damages for unintentional acts under a strict liability standard, however, courts take a harder look at whether a defendant deserves to be subject to potentially immense liability .... In cases where the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff, we are likely to find that individual suits, rather than a single class action, are the superior method of adjudi-

cation.[10]

382 F.3d at 1271; *see also London,* 340 F.3d at 1255 n. 5 (class action device may not be superior method of adjudicating controversy where case involves technical violations of a "complex regulatory scheme, subject to different reasonable interpretations" and "defendants' potential liability would be enormous and completely out of proportion to any harm suffered by plaintiff"); *Wilcox v. Commerce Bank of Kansas City,* 474 F.2d 336, 347 (10th Cir.1973) (concluding that class certification of Federal Truth in Lending Act claims was inferior "where the complaint contains no indication of any actual damages in substantial or provable amount" and "aggregated relief would be oppressive in consequence and difficult to justify"); *In re Trans Union Corp. Privacy Litig. v. Trans Union,* 211 F.R.D. 328, 350–51 (N.D.Ill.2002) (finding class action lacked superiority in part because of due process concerns where statutory damages would be "grossly disproportionate" to any actual damages suffered by plaintiffs); *Ratner v. Chem. Bank N.Y. Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y.1972) (finding class certification lacked superiority where "horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, for ... technical and debatable violation of the Truth in Lending Act").

This Court is not the first in this circuit to consider the proposed certification of a class under the CROA. Applying the above principles, the District Court for the Northern District of Alabama recently denied a plaintiff's motion for class certification in a case involving alleged violations of the same provisions of the CROA that are at issue here. *See Helms,* 236 F.R.D. at 566–68.

In *Helms,* the plaintiff paid $79.95 for a credit monitoring product service sold by the defendant Consumerinfo.com, Inc., which monitors a customer's credit reports daily and periodically alerts the customer of any irregularities or problems. The plaintiff purchased the service in an attempt to remove an erroneous charge from his credit report. After his initial visit to the defendant's website, the plaintiff never returned to the website.

A few months later, the plaintiff filed suit asserting many of the same claims that Plaintiff Hillis asserts here. He alleged that the defendant (1) charged for credit repair services prior to fully performing such services in violation of 15 U.S.C. § 1679b(b); (2) failed to provide adequate written disclosures in violation of 15 U.S.C. § 1679c; (3) failed to enter into written contracts in violation in 15 U.S.C. § 1679d; and (4) failed to provide written notices of cancellation rights in violation of 15 U.S.C. § 1679e. The plaintiff also contended that the defendant made untrue or misleading representations regarding its credit repair services, in violation of 15 U.S.C. § 1679b(a)(3). The plaintiff moved for class certification, seeking to represent a class of all persons who purchased any credit repair service from the defendant, seeking damages equal to the amount paid by all class members.

In denying the plaintiff's motion, the Court relied on *Klay* and *London,* reasoning that, at most, the defendant violated the technical requirements of the CROA and certification would lead to damages that were grossly disproportionate to the conduct at issue. The Court also noted that other than the payment of $79.95, there was no evidence that the plaintiff had suffered any damages. The court summarized its analysis as follows:

> Given that Defendant does not offer fraudulent services, considering that Plaintiff has exhibited little if any actual damages, and with an eye to the likelihood that class damages would be disproportionately large when compared to Defendant's actual conduct, the Court concludes that allowing the

---

**10.** In upholding the district court's certification of the class in *Klay,* the court noted that: (1) RICO (the statute under which the claims were asserted) does not guarantee a fixed amount of damages regardless of the gravity of the defendants' behavior; (2) RICO violations are intentional, and thus there was no danger that the defendants would be subjected to an unjustly harsh verdict for accidental behavior; and (3) RICO violations are predicated upon serious federal criminal acts, and thus plaintiffs were not attempting to obtain a windfall based on minor or technical violations of a complex regulatory scheme. *Klay,* 382 F.3d at 1271–72.

action to proceed in class form is not superior.[11]

*Helms,* 236 F.R.D. at 569–69.

The Court is persuaded by the analysis of the superiority requirement set forth in *Helms.* The CROA is a strict liability statute; if a defendant is within the purview of the CROA and fails to comply with its requirements, the defendant is liable without any showing of negligence, willfulness, or other intent. Under Plaintiff's theory in this case, the damages would equal the revenues that Defendants have realized from the sale of Score Power since 2001–an amount approaching $200 million. This amount does not even take into account the punitive damages and attorneys' fees that Plaintiff seeks.

As in *Helms,* Plaintiff's allegations amount to nothing more than unintentional [12] technical violations of the CROA where the damages sought would be far out of proportion to the violations alleged. If this class were certified, every consumer who purchased Score Power-related services would receive a refund, even for things he or she in fact received such as credit reports and credit scores.

Additionally, besides the amount that Plaintiff spent in purchasing Score Power, there is no evidence that Plaintiff has suffered any damages. On five separate occasions Plaintiff paid $14.95 for Score Power, and he admits that he knew exactly what he was purchasing. Although Plaintiff's FICO score went down two points, there is no evidence or even an allegation that this *de minimus* reduction caused him any harm.[13]

Furthermore, as in *Helms,* Plaintiff is not an unsophisticated consumer or a desperate debtor. Plaintiff is college-educated with a masters degree, admits that he had no credit problems when he contacted Defendants, and testified that the last time he checked his FICO score it was 790—placing him in the upper limits of the highest range of FICO scores.

Plaintiff argues that it is error for the Court to engage in an analysis of whether the damages sought in this case are out of proportion to the Defendants' alleged violations, contending that unlike the statutes at issue in *Klay* and *London,* the CROA says nothing about the recovery of statutory damages, and only allows a plaintiff to recover actual damages. Plaintiff cites to the language of the statute, which states in pertinent part that a Defendant who fails to comply with the CROA shall be liable to the Plaintiff for "Actual damages" equal to the greater of "(A) the amount of any actual

---

11. The Court agrees with the *Helms* court's statement that "It is not hard to imagine fraudulent organizations or 'scams' that would fall within the CROA's reach and would also be sufficiently culpable to warrant large scale class punishment. Such organizations exist and the Court raises no objection to severe punishment for these entities that prey on and fleece uneducated consumers. Indeed such situations would be virtually perfect for class adjudication." *Helms,* 236 F.R.D. 561, 568–69. In *Helms,* the court found that the defendant was not such an organization. The Court finds the situation here to be the same. Neither Equifax nor Fair Isaac offers fraudulent services, as demonstrated by the fact that Plaintiff has abandoned any such claim in this case.

12. The Court notes that in *Braxton v. Farmer's Ins. Group,* 209 F.R.D. 654, 662 (N.D.Ala.2002), the court declined to deny class certification on the grounds that the superiority requirement was not met. The plaintiff in that case brought claims under the Fair Credit Reporting Act that, like the claims here, were mostly alleged disclosure violations. The court rejected the argument that class certification was not superior even though technical violations were at issue and there existed the possibility of large damages. In doing so, the court emphasized the fact that the alleged violation under the Fair Credit Reporting Act required a showing of willfulness. The court was careful to note that had the statute imposed strict liability, class certification would lead to disproportionate damages and might be improper. Unlike the provisions at issue in *Braxton,* the CROA does not require a showing of willfulness—it is a strict liability statute. Moreover, in *Braxton* the court noted that the maximum number of class members was approximately 8,750, thus decreasing the possibility of a huge award, whereas here the class would be comprised of potentially millions of members.

13. Indeed, there is evidence in the record indicating that Plaintiff's score may not have dropped because Score Power failed him, but because he did not follow all of the tips provided by Score Power. In particular, Plaintiff contends that he closed two accounts based on information contained in his Score Power report, but the Score Power reports explained that closing accounts was *not* recommended and could cause a credit score to go down.

damage sustained by such person as a result of such failure; or (B) any amount paid by the person to the credit repair organization." 15 U.S.C. § 1679g(a)(1).

Here, Plaintiff seeks damages under 15 U.S.C. § 1679g(a)(1)(B), for the "amount paid by the person to the credit repair organization." Thus, the gist of Plaintiff's position is that the superiority principles articulated in *Klay* and *London* only apply when a plaintiff seeks statutory penalties.

The Court is not persuaded that the rationale of *Klay* and *London* is inapplicable here simply because the CROA nomenclature includes the words "actual damages" rather than "statutory penalties." [14] Regardless of what label Plaintiff or even the CROA itself ascribes to the recovery that Plaintiff seeks, the fact is that the damages Plaintiff seeks are not actual damages, and they do not require any proof that Plaintiff suffered economic harm in connection with Defendants' alleged failure to comply with the CROA. Like a statutory penalty, the damages provision under which Plaintiff seeks relief sets a fixed amount of damages equal to the amount paid to the credit repair organization, regardless of the unjustness of the organization's conduct. *See Klay,* 382 F.3d at 1272; *see also Texas v. Am. Blastfax, Inc.,* 121 F.Supp.2d 1085, 1090–91 (W.D.Tex.2000) (statutory damages are not "confined or proportioned to [actual] loss or damages," and are "imposed as punishment for the violation of a public law"). Plaintiff has offered no evidence that such an amount approximates or in any way corresponds to the amount of economic harm suffered by purchasers of Score Power. Thus, no matter what the label may be, the damages sought here are functionally equivalent to statutory penalties, and the rationale of *Klay* and *London* applies.

Plaintiff also argues that the damages sought are not disproportionately large because certification of the class would not subject the Defendants to liability that is financially ruinous. Plaintiff cites to Equi-

fax's 2005 10Q filings with the Securities and Exchange Commission and Fair Isaac's 2005 annual report in which each Defendant states that an adverse result in this case would not materially affect their operations or financial position. The Court agrees that these representations are admissible as evidence against Defendants. And the Court agrees that a $200 million damages award is unlikely to put Defendants out of business. Nevertheless, the Court finds that such an exorbitant amount is still far out of proportion to the conduct alleged in this case.

Finally, Plaintiff argues that without the class action device, class members have an inadequate remedy because the amount sought by each individual is small and there is little incentive to litigate these claims individually. The Court recognizes this possibility, but finds it significant that the CROA authorizes attorney's fees awards, which helps ensure that individual actions are practical even for those who seek relatively small amounts of money. *See Castano v. Am. Tobacco Co.,* 84 F.3d 734, 748 (5th Cir.1996) (acknowledging that availability of attorney's fees is common basis for finding non-superiority of class action); *see also Cooper v. Sunshine Recoveries, Inc.,* No. 00CIV8898LTSJCF, 2001 WL 740765, at *5 (S.D.N.Y. June 27, 2001) (granting $7,682.48 in attorneys fees based upon an individual CROA claim that settled for $750); *Maguire v. Sandy Mac, Inc.,* 145 F.R.D. 50, 53 (D.N.J. 1992) ("Where a statute provides attorney's fees to a prevailing plaintiff there is less incentive to protect by class certification individuals with class claims").

In sum, with respect to all of Plaintiff's CROA claims, the Court finds that Plaintiff cannot satisfy the superiority requirement. Given that Plaintiff has not suffered any economic loss and complains only of technical violations, and with an eye to the likelihood that class damages would be disproportionately large when compared to Defendants' conduct, allowing this action to proceed in class form simply is not superior.[15]

---

**14.** Indeed, in *London* the damages sought were restitution equal to the amount of the premiums paid by the class members. The damages that

Plaintiff seeks under the CROA are just that—the amount paid by the consumer to Defendants.

**15.** Because the Court declines to certify the class on these grounds, the Court need not address

Accordingly, the Court denies Plaintiff's motion for class certification. This case shall proceed as an individual action.

## III. Analysis of Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment, arguing that (1) Defendants engaged in a joint venture to market and sell Score Power and (2) by virtue of their representations regarding Score Power and related credit-services, Defendants are "credit repair organizations" within the meaning of § 1679a(3) of the CROA. Because Defendants admit that they did not comply with the statutory safeguard provisions of the CROA, if the Court were to grant Plaintiff's motion, the effect would be to grant summary judgment to Plaintiff on his CROA statutory safeguard claims.[16]

### A. Legal Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's

case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* And because "[s]ummary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986).

### B. Joint Venture

■ In an attempt to hold each Defendant liable for the actions of the other, Plaintiff argues that Defendants were engaged in a joint venture to market and sell Score Power. *See Bowman v. Fuller*, 84 Ga.App. 421, 425–26, 66 S.E.2d 249, 253 (1951) (If a joint venture exists, "the acts of one party during the pendency and within the scope of the joint undertaking or enterprise are binding on the other joint adventurer").

Under Georgia law,[17] "[t]he theory of joint venturers arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other." *Accolades Apartments, L.P. v. Fulton County*, 274 Ga. 28, 29–30, 549 S.E.2d 348, 350 (2001) (quoting *Kissun v. Humana, Inc.*, 267 Ga. 419, 420, 479 S.E.2d 751, 752 (1997)). Thus, the essential elements of a joint venture are (1) a pooling of action; (2) a joint undertaking for profit; and (3) rights of mutual control. *See Kissun*, 267 Ga. at 420, 479 S.E.2d 751.

---

Defendants' argument that the Court should not certify the class because it would require the Court to reach a constitutional question regarding the amount of damages sought in this case.

**16.** Plaintiff does not move for summary judgment on his unjust enrichment claim nor his claim that Defendants made untrue or mislead-

ing representations in violation of 15 U.S.C. § 1679b(a)(3).

**17.** Georgia law controls this issue because the terms of use provided to Plaintiff stated that any actions arising from the purchase of credit services would be governed by the law of the state of Georgia.

Based largely on the Score Power agreement that Defendants entered into, the Court finds that all of the elements of a joint venture are satisfied. Pursuant to the agreement, Equifax provided the credit reports and Fair Isaac provided the FICO score. Thus, the agreement called for a pooling of property and labor. Furthermore, there was a *joint undertaking for profit*, as the agreement expressly provided for a revenue sharing arrangement between Defendants. Finally, although the parties dispute the amount of mutual control that existed and how it may have changed over time, it is undisputed that the agreement demonstrates the existence of some amount of mutual control. Thus, the Court concludes that Defendants were engaged in a joint venture.

### C. Score Power as a Service

 To fall within CROA's definition of a credit repair organization, as a preliminary matter, the Court must find that Defendants sell, provide, or perform a *service* (or represent that they do). *See* 15 U.S.C. § 1679a(3). Defendants argue that they are not credit repair organizations because Score Power is a product.

The Court is not persuaded by Defendants' characterization of Score Power as a product. A consumer who purchases Score Power receives a FICO score, a credit report, an explanation of factors that go into the FICO score, and a FICO score simulator allowing a consumer to see how various actions may affect a FICO score. In purchasing Score Power, *consumers gain unlimited access to Score Power for thirty days* and also have access to customer care representatives.

While some of the individual components of Score Power might be products, viewed as a bundled package and taking into account the way it was delivered to a customer over the Internet, Score Power is undoubtedly a service. Defendants attempt to analogize Score Power to a product such as a book on consumer credit matters. However, unlike a book, Score Power reviews each consumer's

unique credit report, calculates the credit score, and provides an analysis of the credit report. In short, Score Power is akin to an interactive credit guide for consumers.

Moreover, pursuant to the broad language in § 1679a(3) of the CROA, Score Power can constitute a service if Defendants simply "represented" that it was one. It is undisputed that Defendants repeatedly referred to Score Power as a service to the media, investors, partners, affiliates, and consumers. For example, in one press release Defendants stated:

> Equifax and Fair Isaac today launched Score Power, the only online credit score delivery *service* for consumers that delivers Fair Isaac's FICO credit risk score— the most widely used score in lending. This *service* represents a nationwide first for consumers who now have immediate, on-demand access to their FICO score via the Internet.

(Emphasis added.) Additionally, in their Score Power agreement, Defendants used the term "service" in describing Score Power. Furthermore, Equifax registered Score Power as a service mark with the United States Patent and Trademark Office.[18]

Finally, Plaintiff has filed a motion for sanctions (whose arguments Plaintiff has adopted in support of his motion for partial summary judgment) in which he contends that Defendants are judicially estopped from denying that Score Power is a service. The basis of Plaintiff's contention is the position taken by Equifax's parent company, Equifax, Inc., in a recent case arising under the federal antitrust laws: *Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F.Supp.2d 1141, 1156 (C.D.Cal.2005).

In that case, Equifax, Inc., which was one of the defendants, argued that in providing a credit report (which is part of the consideration received by a consumer who purchases Score Power) Equifax, Inc. provides a service, not a good. Because only goods and not services were subject to the antitrust laws at

18. Service marks are defined by the United States Patent and Trademark Office as "any word, name, symbol, device, or any combination, used, or intended to be used, in commerce, to identify and distinguish the services of one provider from services provided by others, and to indicate the source of the services."

issue in *Standfacts,* Equifax, Inc. argued that it could not be liable for antitrust violations.

Citing these arguments by Equifax, Inc., Plaintiff contends that Defendants should be estopped from taking a contrary position in this case.

Because the Court readily concludes that Score Power is a service for the reasons stated above, it is not necessary to conduct an exhaustive analysis of Plaintiff's judicial estoppel argument. Suffice it to say that the doctrine of judicial estoppel does not apply unless the party against whom it is invoked was successful in its assertion of its previous, inconsistent position. *See S.J. Groves & Sons Co. v. Fulton County,* 967 F.Supp. 501 (N.D.Ga.1996); *see also Ajaka v. Brooksamerica Mortg. Co.,* 453 F.3d 1339, 1343–44 (11th Cir.2006) (explaining that a "pertinent factor" in determining whether estoppel should be applied is whether the party successfully persuaded a court to accept its earlier, inconsistent position).

Equifax, Inc. was not successful in its argument that Score Power is a service rather than a good until the district court awarded Equifax, Inc. summary judgment on December 7, 2005.

The Court agrees with Plaintiff that Defendants are judicially estopped from taking a position in this case that is inconsistent with the position taken by Equifax, Inc. in *Standfacts,* i.e., from arguing in this case that Score Power is a good and not a service. However, the Court finds that such estoppel did not arise until December 7, 2005,[19] and that until that date Defendants were free to take a position in this case inconsistent with the position taken by Equifax, Inc. in *Standfacts.*[20]

For all of these reasons, the Court concludes that Score Power is a service, or at a minimum, that Defendants represented that it was. *See Helms v. Consumerinfo.com,* 436

F.Supp.2d 1220, 1230 n. 10 (N.D.Ala.2005) (stating that "[c]ommon sense is the most fundamental guide to statutory construction" and concluding that similar credit offerings were "more honestly characterized as a service than as a product").

## D. Interpretation of the CROA

■ Having found that Score Power is a service, the Court now must consider whether Plaintiff has met his burden of proving that as a matter of law Defendants' activities bring them within the remainder of the definition of a credit repair organization set forth in § 1679a(3) of the CROA. To resolve this issue, the Court must first engage in the task of statutory interpretation to ensure that Defendants' activities are viewed in light of the proper reach of the statute.

In interpreting the meaning of a statute, the Court first looks to the plain language of the statute. *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1559 (11th Cir.1989). In doing so, the Court looks "to the design of the statute as a whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). If the statute is unclear or ambiguous, the Court may look to legislative history and other extrinsic evidence. *See Cabalceta,* 883 F.2d at 1559.

The Eleventh Circuit has also instructed that when the plain meaning of a statute produces an "unreasonable [result] plainly at variance with the policy of the legislation as a whole this Court has followed [the purpose of the act], rather than the literal words." *Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1529 (11th Cir.1996) (citations omitted); *see also Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 454–55, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) ("it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of a dictio-

---

**19.** Plaintiff filed his motion for sanctions on December 14, 2005.

**20.** The Court finds that Plaintiff has failed to carry his heavy burden of showing that Defendants should be sanctioned for taking a position in this case (that Score power is a good rather than a service) inconsistent with the position taken by Equifax, Inc. in *Standfacts.* This is

especially true in light of the fact that the estoppel did not arise until December 7, 2005. Thus, as of December 14, 2005, when Plaintiff filed his motion for sanctions, Plaintiff could only complain about Defendants' having taken inconsistent positions for seven days. Accordingly, the Court denies Plaintiff's motion for sanctions.

nary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning").

Applying these principles of statutory construction here, the Court first highlights the Congressional findings and purposes codified in the CROA. Congress's findings were as follows:

(1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.

(2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

15 U.S.C. § 1679(a). In light of these findings, Congress enacted the CROA:

(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

(2) to protect the public from unfair or deceptive advertising And business practices by credit repair organizations.

15 U.S.C. § 1679(a).

With this in mind, the Court now considers the definition of a credit repair organization set forth in the statute. Pursuant to the CROA:

The term "credit repair organization"—

(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or valuable con-

sideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i). . . .

15 U.S.C. § 1679a(3).[21]

Therefore, tracking the language of the statute, Defendants are credit repair organizations if they (1) used any instrumentality of interstate commerce, or the mails, to (2) sell, provide, or perform (or represent that they could do so) (3) in return for valuable consideration (4) services or advice about services (5) for the express or implied purpose of improving a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(3).

Here, the satisfaction of elements (1) through (3) is undisputed, and the Court has determined that element (4) is also satisfied. Defendants used an instrumentality of commerce, namely, the Internet, and received valuable consideration from selling a service. The dispute between the parties centers on whether Defendants sold Score Power for the purpose of improving a consumer's credit record, credit history, or credit rating.

Read in isolation and untethered to Congress's findings and purposes, the definition of a credit repair organization appears sweeping. Indeed, under a broad interpretation, most companies that market and sell services that touch on consumer credit matters could be CROs. Plaintiff urges this Court to adopt such an interpretation, contending that the statute is unambiguous and compels that result.

There is no question that Congress sought to provide broad protection to consumers in enacting the CROA. Nevertheless, just how far that protection extends is not nearly as clear as Plaintiff contends.

---

21. As explained earlier, if an entity is a CRO, the CROA imposes several technical (and by design onerous) restrictions on a CRO's business activities, including the requirements that the CRO: (1) not be allowed to collect payment in advance of fully performing the service (15 U.S.C. § 1679b(b)); (2) make certain written disclosures (15 U.S.C. § 1679c); (3) provide a written contract to the consumer (15 U.S.C. § 1679d); (4) provide a cancellation form to the consumer (15 U.S.C. § 1679e); and (5) provide a copy of the contract to the consumer. (15 U.S.C. § 1679e(c)).

Notably, Congress did not define the statutory terms "credit record," "credit history," and "credit rating"—critical terms that bear on the scope of the statute. Congress could not have intended these terms to encompass all credit-related advice because another provision of the statute not at issue here (15 U.S.C. § 1679b(a)(1))[22] contains a different set of credit terms, namely, "credit worthiness," "credit standing," and "credit capacity." *See Shotz v. City of Plantation,* 344 F.3d 1161, 1168 (11th Cir.2003) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion"); *United States v. Williams,* 340 F.3d 1231, 1236 (11th Cir.2003) ("This deliberate variation in terminology within the same ... statute suggests that Congress did not interpret the two terms as being equivalent").

The statute's omission of a definition for the terms "credit record," "credit history," or "credit rating," along with the statute's sweeping language and its inclusion of different credit terms in another section of the statute, creates an ambiguity in the statute, thereby permitting the Court to consider legislative history and other extrinsic evidence to aid in the task of interpretation.[23] Statutes are not to be interpreted in a vacuum, and the CROA is no exception.

Defendants argue that Congress's use of different terms is indicative of an intent to distinguish between services that seek to improve a consumer's existing credit record that is based on historical, tangible, and displayable data (a consumer's "credit record, credit history, or credit rating") and services that aim to improve a consumer's credit behavior in the future (a consumer's "credit worthiness, credit standing, or credit capacity")—the former being provided by a CRO, while the latter is not.

Defendants' construction of the statute is supported by the contents of the disclosure that the CROA requires CROs to provide to consumers. Specifically, § 1679c(a) of the CROA requires credit repair organizations to provide consumers with a formal written disclosure before any contract or agreement between the consumer and the credit repair organization is executed. The disclosure provides *inter alia* that "neither you nor any 'credit repair' company or 'credit repair organization' has the right to have accurate, current, and verifiable information removed from your credit report." The contents of this disclosure suggest that when Congress used the terms "credit record, credit history, or credit rating," it did not speak of services that pertain to credit generally, but instead sought to target entities and persons who represent that they can improve or alter a consumer's existing credit record that is based on historical, tangible, and displayable data.

Likewise, CROA provides that a credit repair organization may not charge in advance for any service that is provided "for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). The use of "for" suggests that Congress was not regulating credit advice provided *to* consumers generally, but instead was regulating services that were performed *on behalf of* a consumer ("for"), such as contacting a credit bureau to challenge information in a credit report. Similarly, the CROA provides that all credit repair organizations must provide the consumer with a notice that he may cancel his contract without penalty or obligation for three business days after the contract is executed (15 U.S.C. § 1679e). This

---

**22.** This section states that "No person may—(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity ...." 15 U.S.C. § 1679b(a)(1).

**23.** The failure to define "credit record, credit history, or credit rating" is puzzling given Congress's inclusion of other definitions in 15 U.S.C. § 1679a, including a definition for "consumer credit transaction" even though that phrase is not mentioned elsewhere in the statute. This also demonstrates that an analysis of the statute that goes beyond the words of the statute is in order.

waiting period seeks to protect consumers who may unwisely enter into a contract for ongoing services due to a desperate financial situation, but would make it economically impossible for companies like Equifax and Fair Isaac to offer services like Score Power via the Internet because the consumer could void the purchase agreement immediately upon receiving his credit report, score, and other credit-related information.

The legislative history of the statute also supports the narrower interpretation advanced by Defendants. Defendants cite to several examples in the legislative history revealing that when Congress used the term "credit repair organizations," it had a specific type of activity in mind that it sought to regulate. For example, the House Report states:

> The credit repair business involves the marketing of credit repair services to consumers whose consumer reports contain adverse information that interferes with their ability to obtain credit. According to the FTC, these businesses, through advertisements and oral representations, lead consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy .... [S]uch representations by credit repair clinics are often misleading, and consumers, mostly low- and moderate-income individuals, are cheated out of the money they paid for services.

H.R.Rep. No. 103-486, at 57 (1994), 1994 WL 164513 (Westlaw). The House Report also explains that credit repair companies "inundate[e] consumer reporting agencies with so many challenges to consumer reports that the reinvestigation system breaks down, and the adverse, but accurate, information is deleted." *Id.* "[The CROA] seeks to regulate the industry to ensure that consumers are provided with necessary information about credit repair organizations so that they can make informed decisions regarding the purchase of their services and to protect the public from unfair and deceptive advertising and business practices by the industry." *Id.*

Congress's interchangeable use of the terms "credit repair clinic" and "credit repair organization" strongly indicates that Congress sought to regulate a specific type of activity and guard against a particular type of harm—in short, services that purport to improve or repair adverse historical, tangible, and displayable data in a consumer's credit record.

Likewise, the Senate Report illustrates the type of conduct that Congress sought to stamp out with the passage of the CROA:

> [T]he "Credit Repair Organization Act," addresses credit repair fraud. As consumers have experienced problems with the consumer reporting industry, credit repair organizations have emerged offering, for a fee, to help consumers eliminate adverse information from consumer reports. While some of these organizations may benefit consumers, the Committee is aware that a number of fraudulent credit repair organizations have inappropriately led consumers to believe that adverse information in consumer reports can be deleted or modified regardless of the accuracy of the information.

S. Rep. 103-209, *7 (1993), 1993 WL 516162 (Westlaw).

Similarly, the author and sponsor of the bill, Rep. Frank Annunzio, described credit repair organizations as entities that "hold themselves out as companies that can help consumers clean up bad credit histories or obtain a clean credit report" and "claim that they can help consumers remove adverse information from their files even if it is true." *See Hearing on the Credit Repair Organizations Act (H.R. 458) Before the Subcommittee on Consumer Affairs and Coinage of the House Committee on Banking, Finance, and Urban Affairs,* 100th Congress, 145 (Sept. 15, 1988).

Other statements in the legislative record share the same theme. For instance, when individual members of Congress discussed the purpose of the CROA, members repeatedly decried the problem of credit repair "doctors" who promised to remove accurate, non-obsolete information in credit reports or encouraged consumers to use unethical tac-

tics to deceive credit rating agencies.[24]

The Supreme Court has made it clear that where legislative history focuses on Congress's intention to address a particular problem, the statute should be construed to apply to that problem and not to other issues that Congress expressed no intention to address. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 587–94, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004).

Accordingly, tethered to Congress's findings, purposes, and the legislative history, it becomes apparent that the definition of a credit repair organization is narrower than a cursory reading of the statute would indicate. Specifically, when the statute refers to services whose purpose is to improve a consumer's "credit record, credit history, or credit rating," these terms to refer to a consumer's historical credit record. Congress did not intend for the definition of a credit repair organization to sweep in services that offer only prospective credit advice to consumers or provide information to consumers so that *they* can take steps to improve their credit in the future.

To utilize an analogy from the sport of golf, a CRO is like a person who offers to improve a golfer's score after a round is over by reviewing and making changes to the golfer's score card or by telling the golfer how he can make changes to his score card.

By contrast, a person who offers to give a golfer swing tips to improve his score the next time he heads out on the course is not a CRO.

Notably, the Court's interpretation is consistent with a recent policy statement issued by the FTC, the agency charged with enforcing the CROA. *See* 15 U.S.C. § 1679h(a). In a letter dated July 1, 2005, to U.S. Congressional Representative Edward R. Royce, the FTC recognized that "some parties have interpreted CROA to cover companies that offer credit monitoring and other educational products based on consumers' credit files" and that the FTC was "aware that private lawsuits have been filed under CROA to challenge practices relating to the sale of credit monitoring products." The FTC issued the following statement:

> As a matter of policy, the Commission sees little basis on which to subject the sale of credit monitoring and similar educational products and services to CROA's specific prohibitions and requirements, which were intended to rein in fraudulent credit repair. In contrast, credit monitoring services—if promoted and sold in a truthful manner—can help consumers maintain an accurate credit file and provide them with valuable information for combating identity theft.[25]

---

**24.** *See, e.g.*, 136 Cong. Rec. E579–02, E580 (1990) (Statement by Rep. Price), 1990 WL 30585 (Westlaw) (CROs offer to "fix" credit reports); 136 Cong. Rec. H5325–02, H5325 (1990) (Statement by Rep. Annunzio), 1990 WL 103877 (Westlaw) ("CROs hold out the promise of a quick credit fix at a high case price"); H.R.Rep. No. 102–692, at 42 (1992), 1992 WL 179676 (Westlaw) (CROs "lead consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy"); 138 Cong. Rec. H9370–03, H9375 (1992) (Statement by Rep. Torres), 1992 WL 237537 (Westlaw) (CROs are "more often than not" scam artists); H.R. Rep. 103–486 (1994), 1994 WL 164513, at *60 (Westlaw) (CROs lead consumers to believe adverse information can be deleted or modified regardless of accuracy); 140 Cong. Rec. S5028–02, S5029 (1994) (Statement by Sen. Riegle), 1994 WL 164265 (Westlaw) (consumers being defrauded by so-called "credit doctors" who offer "to assist consumers in cleaning up their credit files"); 140 Cong. Rec. E1247–01, E1247 (1994) (Statement by Sen. Kennedy), 1994 WL 267679 (Westlaw) (must weed out "corrupt actors" in the credit repair business); 140 Cong. Rec. H9797–05, H9810 (1994) (Statement by Sen. Kennedy), 1994 WL 526868 (Westlaw) (same).

**25.** The Court notes that the congressional record does show that an exemption for credit bureaus in the CROA was considered and proposed as an amendment, but it was not adopted nor supported by the FTC. *See* H.R. 100–458, Proposed Amendment to Consumer Credit Protection Act (Jan. 7, 1987). The fact that an exemption was not adopted does alter the Court's analysis. The FTC has explained that it did not support a proposed amendment to exempt from CROA's coverage consumer reporting agencies because such an exemption could have a discriminatory effect on sellers of credit monitoring services not covered by the exemption, and the breadth of the exemption could allow fraudulent credit repair firms to evade the CROA. Moreover, if a credit reporting firm decides to offer a service that falls within the purview of the CROA, there is no reason that the CROA should not apply.

Although the FTC's statement is not binding on the Court, as a non-adjudicative statement of policy by the agency charged with enforcement of the statute, the letter carries some weight. *See Christensen v. Harris,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

Moreover, although the case law is conflicting and there is a paucity of it, the Court's interpretation is supported by two recent cases that discuss the scope of the CROA, *Limpert v. Cambridge Credit Counseling Corp.,* 328 F.Supp.2d 360, 364 (S.D.N.Y. 2004), and *Plattner v. Edge Solutions, Inc.,* 422 F.Supp.2d 969, 974 (N.D.Ill.2006).

In *Limpert,* the Court rejected the notion that every type of service that concerns a consumer's credit falls within the definition of a CRO. Most importantly, the *Limpert* court recognized a distinction between businesses that claim they can repair a consumer's existing credit record—which are CROs—and legitimate businesses who at worst "promis[e] rewards for future creditworthiness"—which are not CROs. 328 F.Supp.2d at 364. In doing so, the *Limpert* court explained:

> Legitimate credit counseling, which endeavors to gradually improve clients' credit by encouraging creditworthy behavior going forward, is distinct from illegitimate forms of credit repair in which the clients are given false hopes of absolution for confessed past credit sins. Yet there is a fine line, in advertising and soliciting for credit counseling services to an unsophisticated audience of lower-income debtors, between promising future rewards for creditworthiness, and implying that existing bad credit records may be prematurely expunged.

*Id.*

Additionally, the *Plattner* court rejected the Plaintiff's reading of the CROA, which it characterized as being "arguably consistent with the broadest possible interpretation of the statutory language." 422 F.Supp.2d at 974–75. Relying on the statute's findings, purposes, and legislative history, the court recognized:

> Since Congress was concerned with 'credit repair organizations,' this court reads the statute to reach such entities whose focus is the improvement or repair of a consumer's credit record, credit history or credit rating, expressly or implicitly, not entities whose activities are aimed at assisting consumers in developing "creditworthy behavior" ... which may result in improved actual credit as a collateral consequence, rather than as a program objective.

*Accord Wojcik v. Courtesy Auto Sales, Inc.,* No. 8:01 CV 506, 2002 WL 31663298, at *8, 2002 U.S. Dist. LEXIS 22731, at *24 (D.Neb. Nov. 25, 2002) (distinguishing between "helping [consumers] build credit" and "fixing [consumer's] bad past credit"); *but see Helms, supra.*

Finally, if the Court were to accept Plaintiff's interpretation of the statute, doing so could lead to anomalous results that might thwart the efforts of Congress and the FTC to increase consumer literacy regarding credit matters. *See Hughey,* 78 F.3d at 1529 (explaining that "Congress is presumed not to have intended absurd impossible results" or even "an odd result"). In a report to Congress, the FTC expressly recognized the valuable role played by providers of credit information products in the expansion of consumer financial literacy. *Report to Congress: Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003,* at 72 (Dec.2003), *http://www.ftc.gov/reports/facta/041209factarpt.pdf* (last visited August 18, 2006).

If providers of services like Score Power are CROs, it will be highly impractical for those entities to comply with the technical provisions of the CROA and still provide the information sought by consumers in the manner sought by consumers. For instance, for Score Power, it would be impractical to collect payments after the service is sold to the consumer, particularly because the consumer is given a three-day right of rescission under § 1679c of the CROA and cannot be required to pay "before such service is fully performed" under § 1679b(b). Under this regime, many consumers would never have to pay for a service like Score Power because they could simply exercise their right of rescission, thereby eliminating any incentive for companies to offer these services. This

anomalous result provides the Court another basis to reject Plaintiff's construction of the statute.

For all of these reasons, the Court is persuaded that the terms in the definition of a CRO (credit record, credit history, and credit rating) all refer to components of a consumer's historical, tangible, and displayable credit record. In short, Congress defined a CRO in a way that focuses not on "credit" generally, but instead on those who claim they can undo or improve a consumer's past, historical, displayable, and tangible credit record.

Having ascertained what a CRO is, the Court next must consider whether Plaintiff has carried his burden of proving that as a matter of law Defendants fall within that definition. In an attempt to carry this burden, Plaintiff points to a host of documentary evidence that he argues proves that Defendants either expressly stated or at least implied that Score Power helps consumers improve their "credit history, credit record, or credit rating."

For example, Defendants made a variety of statements in press releases and other advertising materials, including representations that Score Power helps a consumer "understand his or her credit standing," "improve his or her credit outlook," "improve his or her credit score," "stay in control of his or her credit," and "improve and manage credit." Defendants also represented that "your personalized Score Power analysis will tell you which factors in your credit history most

affect your credit score and therefore your credit rating." [26]

Defendants argue that many of these statements may show that they represented that Score Power helps a consumer improve his or her credit generally, but that they do not specifically invoke the statute's "buzzwords," i.e., that Score Power improves a consumer's "credit record, credit history, or credit rating." [27]

The Court is not convinced by Defendants' argument. Defendants all but concede that a statement that Score Power can improve a consumer's "credit score" is equivalent to a statement that Score Power can improve a consumer's "credit history" or "credit record" because a credit score is derived from the consumer's credit record and credit history. And in any event, it is undisputed that Defendants used the statutory buzzwords in at least some of their statements about Score Power.

Nevertheless, the Court is not persuaded that Plaintiff has otherwise carried his burden of proving that Defendants as a matter of law are CROs. First, although Defendants may have used the statutory buzzwords, the average consumer might well construe Defendants' statements concerning Score Power to mean simply that Score Power will provide them with information, including their credit score, so that *they* can take steps to improve their credit score in the future. There is at least a genuine issue of material fact as to whether Defendants, through their representations, implied to the average consumer that

---

**26.** Plaintiff also highlights metatags and keywords such as "credit repair," "credit standing," and "credit history," which Defendants used to drive internet traffic to their respective websites. Essentially, metatags and keywords are descriptive terms put into the source code of a website so that search engines such as Yahoo! or Google can find a website based on a user's search terms. The Court is not persuaded by Plaintiff's attempt to turn these metatags and keywords into advertisements. Consumers do not see metatags and keywords, and they are not necessarily an accurate description of a website. As one commentator explained, "These owners may want to accurately describe the content of their pages in order to increase their ability to communicate and to enhance their commercial position. But owners may also use metatags that are not an accurate description of the site ... and

that are often entirely unrelated to the actual contents of the Web site" in an attempt to increase the number of visitors to that website. William Romanos, *Internet Accuracy Wars: How Trademarks Used in Deceptive Metatagging Should Be Dealt with to Increase Economic Efficiency*, 7 U. Balt. Intell. Prop. L.J. 79, 80 (1998).

**27.** The parties do not brief the question of what impact, if any, Plaintiff's inability to recall many of these representations has on his ability to show that Defendants are CROs. Because the parties do not fully brief the issue, the Court does not address it. However, the Court notes that it has concerns regarding a plaintiff's ability to show that a defendant is a credit repair organization without having seen the representations upon which he relies to make this showing.

they performed a form of credit repair or instead were merely engaged in a form of legitimate credit counseling to help consumers improve their FICO scores over time. *See Limpert*, 328 F.Supp.2d at 364 (legitimate forms of credit counseling not actionable under the CROA).

Moreover, the Court is also unable to decide that as a matter of law Score Power was sold "for the express or implied purpose" of improving a consumer's credit record, credit history, or credit rating within the meaning of the CROA. Notably, Plaintiff must show that "the"—not "a" purpose of Score Power was to improve a consumer's credit record. *See Sannes v. Jeff Wyler Chevrolet, Inc.*, No. C–1–97–930, 1999 WL 33313134, at *4 (S.D.Ohio Mar. 31, 1999) (alleged credit repair activities of auto dealership were ancillary to primary purpose of selling cars and thus dealership was not a CRO); *White v. Fin. Credit Corp.*, No. 99 C 4023, 2001 WL 1665386, at *1, 6, 2001 U.S. Dist. LEXIS 21486, at *1, 16 (N.D.Ill. Dec. 20, 2001) (refusing to find that Defendant was a CRO even though it offered to improve credit history because that statement was ancillary to main business).

Viewing the facts in the light most favorable to Defendants, as the Court must do at the summary judgment stage, Plaintiff has failed to carry his burden of proving entitlement to judgment as a matter of law. At a minimum there are genuine issues of material fact remaining as to whether Score Power was advertised as a "service ... for the purpose of improving" the consumer's credit record, credit history, or credit rating, or whether it was merely marketed and advertised as an informational resource for consumers to obtain their FICO score and learn more about what actions they could take on their own to adopt desirable credit behaviors in the future. For all of these reasons, Plaintiff's motion for partial summary judgment is denied.[28]

## IV. Conclusion

For the foregoing reasons, the Court DENIES Plaintiff's motion for class certification

[127], DENIES Plaintiff's motion for partial summary judgment [129], DENIES Defendants' motion to amend their answers [170], DENIES Plaintiff's motion for sanctions [167], DENIES Defendants' motion to stay consideration of the underlying merits of Plaintiff's claims pending a decision on class certification [122], and DENIES Defendants' motion for an extension of time to file a motion for summary judgment [175].

### ORDER MODIFYING AUGUST 18 ORDER

The Court hereby modifies its August 18, 2006 Order by deleting the final paragraph thereof, i.e., the Rule 54(b) direction of the entry of final judgment.

---

28. Because the Court denies Plaintiff's motion for partial summary judgment on these grounds, the Court does not address Defendants' additional argument that constitutional concerns militate against construing the statute in Plaintiff's favor.